COMPANIA CONSTRUCTORA BECHTEL-McCONE, S.A. v. McDONALD.

No. 11222.

Circuit Court of Appeals, Ninth Circuit.

Oct. 11, 1946.

Rehearing Denied Nov. 9, 1946.

O'Melveny & Myers and Jackson W. Chance, both of Los Angeles, Cal. (Leo A. Deegan, of Los Angeles, Cal., of counsel), for appellant.

Russell H. Pray and E. W. Sheridan, both of Long Beach, Cal., for appellee.

Before DENMAN, BONE, and ORR, Circuit Judges.

ORR, Circuit Judge.

In May 1944 appellant, a corporation citizen of the Republic of Venezuela, to whom we shall hereafter refer as the Company, was building a refinery on Bahrein Island in the Persian Gulf. Appellee, a citizen of California, who was previously under a temporary employment agreement executed in California with Bechtel-McCone Corporation (which was engaging employees in the United States to work for the Company), arrived on Bahrein Island on May 28, 1944, and there entered into a permanent written employment agreement with the Company. In this agreement appellee agreed to work for the Company for 18 months as a boilermaker at a salary of $450 per month. In clause 6 of the contract appellee agreed:

"To comply with and abide by all general regulations and instructions from time to time issued by Company, * * * including those governing hours and conditions of work, and to obey all lawful orders given by the Company, its manager, or other duly authorized person or persons."

Clause 9 of the contract provided that the Company might terminate appellee's service at any time without notice on payment of thirty days salary, and Clause 10 permitted the Company to terminate appellee's "service hereunder at any time for cause, such as insubordination * * * non-compliance with Company's regulations or instructions * * *." Clause 12(b) provided that if appellee's service was terminated for cause, the Company would be under no obligation to pay any of appellee's expenses for transportation back to the United States.

Appellee was assigned to work as a boilermaker, along with 30 to 40 others, under one Tam, who was one of three or four boilermaker foremen. These foremen in turn were under one Gratz, the general boilermaker foreman. Appellee, as the other boilermakers, had a crew of Arab laborers assigned to him to carry tools and do other manual labor.

A few days prior to July 9th, Tam ordered appellee to take some of the Arabs and bring turnbuckles and other tools which Tam said were needed for the construction of a bubble tower on which appellee was then working. Appellee, after protesting that the turnbuckles and tools were too heavy to carry without a truck, failed to obey his foreman's order, and left the tools where they were. The turnbuckles weighed about 10 to 12 pounds each and two would have sufficed for the work at the bubble tower. The turnbuckles were approximately "a long city block and a half" or "approximately a quarter of a mile," from appellee's place of work at the bubble tower.

On July 9th appellee was working overtime assembling another section of the tower so that a crane could be released

for work elsewhere the next day. Tam came up to appellee during the overtime period and demanded to know where the turnbuckles were. Appellee replied to the effect that they were not the proper tools to use, and that he had virtually finished the job with key plates rather than turnbuckles. Appellee also said he had sent his Arabs after the turnbuckles some days previously but that they could not find them. Tam again ordered appellee to get the turnbuckles and appellee again replied that it was not necessary. The argument then, in appellee's words, became "more heated," but, although there was some testimony that appellee gave Tam a shove, and "put up his [appellee's] dukes," no blows were struck. Appellee testified that he intended to hit Tam but did not. Tam told appellee he was discharged, although Tam had no authority to discharge boilermakers.

Appellee then left the job and went over to wait for a bus to return to his living quarters. Tam testified that he took some of appellee's Arab laborers, got the turnbuckles, and completed the job within about 30 minutes.

While waiting for the bus, appellee told McAuliffe and Vessels, the Company's project manager and assistant manager, the two men in charge of the Bahrein Island project, of his altercation with Tam, and requested to be transferred to another job. They told appellee they disapproved of transfers in general, but McAuliffe stated he "would see." McAuliffe testified that he said he would investigate the circumstances, and for appellee to report back to Vessels the next morning.

The next morning, July 10th, when appellee reported back to the office he met Gratz, the general boilermaker foreman. Gratz, who had authority to discharge, subject to written approval of McAuliffe, after some conversation indicating displeasure because appellee had spoken to McAuliffe before coming to him (Gratz), told appellee, "You are fired." Appellee requested McAuliffe to transfer him for work under the supervision of another foreman. McAuliffe refused and ordered appellee to go back to work under Tam. Appellee declined to obey the order and went to his living quarters to await transportation to the United States.

The trial court, sitting without a jury, found that it was appellee's duty to comply with Tam's order to get the turnbuckles, and that appellee had not obeyed that order and had no intention of obeying it, and further, that the disobedience amounted to insubordination.

The court also found that on the evening of July 9th, the day of the altercation, McAuliffe and Vessels elected to overlook the insubordination when they ordered appellee to report back the next day. Further, the court found that the Company did not accept Gratz' action in discharging appellee.

On these findings the court held that when McAuliffe ordered appellee to return to work under Tam appellee could not have been expected to comply because an impossible condition had been created by Tam; that the Company thereby breached the contract and, therefore, appellee was entitled to recover in this action.

On appeal the Company contends that, (1) there is no support in the record for the trial court's finding that Tam had created an impossible condition of employment for appellee, and further, that this finding is inconsistent with the court's prior finding that appellee disobeyed Tam's lawful instructions; (2) that no support is found in the record for the court's finding that McAuliffe, by his order that appellee return to work under Tam, prevented appellee from further performance of the contract; and (3) that the Company was within its rights in refusing to transfer appellee to work under another foreman; and, further, that appellee voluntarily abandoned his rights under the contract by refusing to obey McAuliffe's order to return to work under Tam.

The contention of appellant that the record fails to sustain a finding that it was impossible for appellee to resume work under Tam because he, Tam, had created an impossible situation, is well taken.

Stripped of non-essentials, the record shows that Tam, as he was clearly entitled

to do, instructed appellee to get certain tools for use on a job of which Tam was foreman. Appellee suggested a different method of handling the work, of which method Tam did not approve, whereupon appellee disobeyed the order, substituting. his own judgment for that of his foreman. The resulting dispute, occurring after a day's work in the intense heat of the area, became bitter but no blows were struck (although appellee stated he intended to hit Tam).

It was appellee's refusal to obey orders that brought on the dispute. Notwithstanding the method suggested by appellee of performing the work may have resulted in a more expeditious and satisfactory handling of the job, it was his duty to obey lawful orders. Tam was the foreman, placed in charge by the Company, who was the sole judge of Tam's efficiency and, although appellee may not have agreed with the methods employed, unless the orders can be said to be unreasonable, it was his duty to obey. We think the orders were reasonable and, therefore, if an impossible condition resulted it was appellee, not Tam, who created it.

A finding of a lower court will not be disturbed on appeal unless it is clearly erroneous, but here, support for a finding that Tam created an impossible situation is wholly lacking in the record. Appellee was unwilling to resume work under Tam, although had he done so and obeyed reasonable orders, it may well have resulted in proper treatment being accorded him.

■ Thus, appellee first breached the contract and gave the Company sufficient cause to "fire" him had it elected so to do, but, argues appellee, if it be found that he was guilty of breach of contract the Company waived the breach by offering to continue him in their employ. The alleged waiver is said to find support both in the circumstances of appellee's meeting with McAuliffe and Vessels on the afternoon of July 9th and the District Court's finding that McAuliffe "elected to overlook what had occurred." That finding has no support in the record. The testimony shows

merely that McAuliffe told appellee to report back the next day and that he meanwhile would investigate the circumstances, and that "we will see."

■ McAuliffe could not have known all of the facts, having heard only appellee's side of the controversy. Under these circumstances he could not have waived or condoned appellee's breach of the contract, since a waiver is an intentional relinquishment of a *known* right. Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357; Goold v. Singh, 88 Cal.App. 339, 343, 263 P. 548. Competent managers (and we have a right to assume McAuliffe was one, otherwise he would not have been placed in charge of such an important job) do not formulate personnel policies nor resolve disputes between foremen and employees on the basis of a hurried or partial statement of one side of the controversy.

■ In effect, all McAuliffe told appellee was to report back the next day for McAuliffe's decision. Nor can McAuliffe' action on the morning of July 10th be construed as a waiver of his right to discharge appellee for the latter's insubordination. On that morning after McAuliffe had investigated the dispute, he did not discharge appellee, but, on the contrary, told him to go back to work under Tam. This appellee refused to do and thereby again breached the contract. The offer of McAuliffe to continue appellee in the Company's employ was conditional, not absolute. Appellee rejected the conditions. The situation in which appellee found himself was of his own making. He cannot take advantage of his own wrong by refusing to obey McAuliffe's order to return to work under Tam and then accuse the Company of breach of contract on the ground that the Company prevented him from performing by ordering him to resume work under Tam because it was impossible for him to work under Tam when the impossibility, if any, existed, was brought on by appellee's own default in refusing to obey a reasonable order.[1]

---

[1] Taylor v. Sapritch, 38 Cal.App.2d 478, 481, 101 P.2d 539; cf. Bewick v. Mecham, 26 Cal.2d 92, 99, 156 P.2d 757, 157 A.L.R. 1277.

Appellee contends that he is not held to a literal standard of absolute obedience, and that substantial compliance by an employee is sufficient, which is true, but the rule cannot afford appellee any comfort in this case, since here appellee at least twice refused absolutely to comply with reasonable orders given by Tam and McAuliffe. A refusal to obey lawful instructions is not substantial compliance.

Appellee also contends that the only thing which deterred him from completing full performance of his contract was "the arbitrary refusal of the appellant [the Company] to transfer the appellee to the supervision of one of three other boilermaker foremen assigned to the Bahrein Project."

Employees cannot dictate to the Project Manager their assignments on construction projects, and a manager's failure to comply with their personal wishes is not an "arbitrary refusal" justifying an insubordinate disregard of orders, in violation of a written contract of employment. Even the modern and more enlightened relationship of master and servant does not reach that far.

Appellee broke his contract by refusing to obey the lawful orders of his foreman; he continued his breach by refusing the opportunity given him by the Project Manager to return to work; hence, he is not entitled to recover.

Judgment reversed.