**LOEW'S, Inc. v. COLE.**

No. 12222.

United States Court of Appeals
Ninth Circuit.

Nov. 22, 1950.

See also 76 F.Supp. 872.

Irving M. Walker and Herman F. Selvin, Los Angeles, Cal., for appellant.

Kenny & Cohn, Los Angeles, Cal., Bartley C. Crum, New York City, Margolis & McTernan and Charles J. Katz, all of Los Angeles, Cal., for appellee.

Before BONE and POPE, Circuit Judges, and McLAUGHLIN, District Judge.

POPE, Circuit Judge.

In the month of October, 1947, the Committee on Un-American Activities of the House of Representatives conducted a public hearing, at Washington, for the purpose of inquiring into alleged Communist infiltration into the motion picture industry.[1] Among dozens of witnesses called, beginning October 20, and concluding October 30, were the appellee, Lester Cole, and a number of the executives of the appellant, Loew's, Incorporated, a Delaware Corporation, engaged, under the trade name of Metro-Goldwyn-Mayer, in the production and distribution of motion pictures. Cole had been employed by Loew's as a writer of screen plays since 1945. He was cur-

---

1. The general powers of the Committee were set forth in the Legislative Reorganization Act of 1946, 60 Stat. 828. The public hearing referred to was the same one discussed in Lawson v. United States (Trumbo v. United States), D. C.Cir., 176 F.2d 49.

rently employed under a written contract to which we shall presently refer.

At the hearing Cole, and some nine other screen writers, who came to be known in the current newspaper accounts of the hearing (which had extremely wide notice in the press and on the radio) as the ten "unfriendly" witnesses, were accompanied by counsel who challenged the validity of the investigation and the power of the Committee to conduct the inquiry or to issue the subpoenas served, by a so-called motion to "quash the subpoenas". When Cole was called to the stand he was asked "Are you now or have you ever been a member of the Communist Party?" The statement he then made was interpreted by the committee as a refusal to answer, and he was cited on November 24, 1947, by the House of Representatives for contempt, and was thereafter indicted for contempt of Congress.

Cole's employment contract contained a paragraph 5 which read: "The employee agrees to conduct himself with due regard to public conventions and morals, and agrees that he will not do or commit any act or thing that will tend to degrade him in society or bring him into public hatred, contempt, scorn or ridicule, or that will tend to shock, insult or offend the community or ridicule public morals or decency, or prejudice the producer or the motion picture, theatrical or radio industry in general."

Cole was the last of the eleven "unfriendly" witnesses called. He testified on October 30. On December 2, following, he was sent a notice of suspension reading as follows: "Dear Mr. Cole: At a recent hearing of a committee of the House of Representatives, you refused to answer certain questions put to you by such committee. By your failure to answer these questions, and by your statements and conduct before the committee and otherwise in connection with the hearings, you have shocked and offended the community, brought yourself into public scorn and contempt, substantially lessened your value to us as an employee, and prejudiced us as your employer and the motion picture industry in general. By so doing you have violated your obligations under your contract of employment with us and your legal obligations to us as our employee. Accordingly, and for good and sufficient cause, this is to notify you that we have elected to suspend your employment and payment of your compensation under your contract of employment with us dated December 5, 1945, as amended, commencing as of December 3, 1947, and continuing until such time as you are acquitted or have purged yourself of contempt of the Congress of the United States and you declare under oath that you are not a Communist. This action is taken by us without prejudice to, and we hereby reserve, any other rights or remedies which we may have. Very truly yours, Loew's Incorporated, by Louis K. Sidney, Asst. Treasurer."

Cole then filed this action, alleging the existence of a controversy arising out of this notice, and as to the right of Loew's to suspend Cole from his employment, and praying declaratory and other relief. The answer admitted the existence of a controversy, the written agreement between the parties, and the notice, denying other allegations of the complaint, and demanded a jury trial.

A form of special verdict, containing four questions, was submitted to the jury. Although no general verdict was called for, the court gave extensive instructions. The verdict was as follows:

"Question 1: Did the plaintiff Lester Cole by his statements and conduct before the House Committee on Un-American Activities, in connection with the hearing held by said Committee, bring himself or tend to bring himself into public hatred, contempt, scorn, or ridicule? (Answer 'yes' or 'no'.) Answer: No.

"Question 2: Did the plaintiff Lester Cole, by his statements and conduct before the House Committee on Un-American Activities, in connection with the hearing held by said Committee, tend to shock, insult or offend the community? (Answer 'yes' or 'no'.) Answer: No.

"Question 3: Did the plaintiff Lester Cole, by his statements and conduct before

the House Committee on Un-American Activities in connection with the hearing held by said Committee, prejudice the defendant Loew's Incorporated as his employer or the motion picture industry generally? (Answer 'yes' or 'no'.) Answer: No.

"Question 4: Did the defendant Loew's Incorporated by its conduct towards the plaintiff, subsequent to the hearing, waive the right to take action against him by suspending him? (Answer 'yes' or 'no'.) Answer: Yes."

The court adopted the findings of the jury and made additional ones of its own; that what Cole did before the Committee was within his rights; that he did not breach his contract; that prior to the time Cole testified, Loew's led Cole to believe that if he conducted himself before the Committee as he did, he would not thereby become liable to suspension; and that after Cole had appeared before the Committee, Loew's with full knowledge of the facts, by choosing to retain him in their employ, elected to keep the contract in full force. Judgment was entered adjudging that Loew's had no right to suspend Cole's employment or compensation, ordering his reinstatement, and awarding Cole $75,600 in back pay, and retaining jurisdiction to see to it that subsequently maturing payments of wages should be made when due.

Appellant specifies numerous asserted errors in instructions given and refused, and in the admission and rejection of evidence. Before we have occasion to deal with the points thus made, we must consider two other contentions.

■ First, it must be noted, appellant asserts that the trial judge should have transferred the case because of bias and prejudice charged to him by an affidavit filed pursuant to Title 28, U.S.C.A. § 144. The substance of the affidavit was that at a time prior to the removal of the action to the court below (and possibly prior to its filing in the state court), the trial judge, during a social evening at a friend's home, during a discussion about the Committee hearings, the indictments and the suspensions and discharges, "said in substance

and effect that in his opinion there was no legal justification for the suspension or discharge of any of the persons whose conduct before the Committee resulted in their indictment; that he hoped that none of the cases arising out of such suspensions or discharges came before him but if they did, he would have no alternative but to render judgment for the plaintiff in such actions; and that if he were the attorney for such plaintiffs, he could recover judgment in their favor for millions of dollars."

Appellant, while conceding that prejudgment of a question of legal right does not always work a disqualification of a judge, yet contends that if such prejudgment is derived from extra-judicial information, acquired from sources other than those presented to the court in the course of judicial proceedings before him, then the bias and prejudice contemplated by the Act exists. Such it is said, was the situation here.

The court held that the affidavit showed no more than the expression of a prior opinion upon a legal question, and that in failing to state any fact indicating that the judge had a personal bias or prejudice in favor of one party, or against the other, it was insufficient. With this holding we agree.

■ On behalf of Cole it is insisted that judgment should have gone for him as a matter of law. If this position is correct, then we must necessarily affirm, no matter what errors may be found in the court's instructions. So we must first deal with this contention before considering any of the errors assigned by the appellant.

At the time the court's judgment was entered the trial judge prepared and filed an extended opinion. D.C., 8 F.R.D. 508. This opinion creates the impression that the judge held a like view, namely that the undisputed facts compelled a judgment for Cole.

It is argued that what Cole did at the hearing was not a violation of his contract. Thus the court found that "The acts and conduct of the plaintiff before said

House Committee were within the plaintiff's rights and did not constitute any breach on the part of the plaintiff of his contract of employment with the defendant."[2] Further, appellee says that a fair reading of paragraph 5 of the employment contract, quoted above, (and which he calls the "morals clause")[3] will disclose that it was not intended to prohibit the sort of thing done by Cole when he was called to testify; that his conduct there was "political", and citing the sections of the California Labor Code,[4] which forbids the employer to use his power as such to coerce or influence the political action or activity of his employees, Cole says that if paragraph 5 is not to be held void under those sections, it must be construed as he contends.

There is no room for doubt as to just what Cole did before the Committee. A transcript of his testimony is a part of the pre-trial order. This discloses that the Committee sought to elicit from him answers to two questions: "Are you a member of the Screen Writers' Guild?", and "Are you now or have you ever been a member of the Communist Party?" All that need be said is that although Cole stated he would be very happy to answer these questions, the Committee did not succeed in getting an answer from him to either one.[5]

2. It is not altogether clear whether the court so stated by way of adopting the findings of the jury, or whether it was holding that this was so as a matter of law.

3. Appellant calls the same paragraph the "public relations clause."

4. §§ 1101, 1102, 1103.

5. After some preliminary questions and answers the examination proceeded as follows:

"Mr. Stripling: Mr. Cole, are you a member of the Screen Writers' Guild?

"Mr. Cole: I would like to answer that question and would be very happy to. I believe the reason the question is asked is to help enlighten—

"Mr. Chairman: No, no, no, no, no.

"Mr. Cole: I hear you, Mr. Chairman, I hear you, I am sorry, but—

"The Chairman: You will hear some more.

"Mr. Cole: I am trying to make these statements pertinent.

"The Chairman: Answer the question, 'Yes' or 'No'.

"Mr. Cole: I am sorry, sir, but I have to answer the question in my own way.

"The Chairman: It is a very simple question.

"Mr. Cole: What I have to say is a very simple answer.

"The Chairman: Yes, but answer it 'Yes' or 'No'.

"Mr. Cole: It isn't necessarily that simple.

"The Chairman: If you answer it 'Yes' or 'No', then you can make some explanation.

"Mr. Cole: Well, Mr. Chairman, I really must answer it in my own way.

"The Chairman: You decline to answer the question?

"Mr. Cole: Not at all, not at all.

"The Chairman: Did you ask the witness if he was here under subpoena?

"Mr. Cole: What is it, Mr. Chairman? I beg your pardon?

"Mr. Stripling: Mr. Cole, you are here under subpoena served upon you on September 19, are you not?

"Mr. Cole: Yes, I am.

"Mr. Stripling: And the question before you is: Are you a member of the Screen Writers' Guild?

"Mr. Cole: I understand the question, and I think I know how I can answer it to the satisfaction of the committee. I wish I would be permitted to do so.

"The Chairman: Can't you answer the question?

"Mr. Cole: You wouldn't permit me to read my statement and the question is answered in my statement.

"The Chairman: Are you able to answer the question 'Yes' or 'No' or are you unable to answer it 'Yes' or 'No'?

"Mr. Cole: I am not able to answer 'Yes' or 'No'. I am able, and would like to answer it in my own way. Haven't I the right accorded to me, as it was to Mr. McGuinnness and other people who came here?

"The Chairman: First, we want you to answer 'Yes' or 'No', then you can make some explanation of your answer.

"Mr. Cole: I understand what you want, sir. I wish you would understand that I feel I must make an answer in my own way, because what I have to say—

"The Chairman: Then you decline to answer the question?

"Mr. Cole: No, I do not decline to answer the question. On the contrary, I would like very much to answer it;

It is not seriously contended that he did not refuse to answer. It was for such refusal he was cited and indicted. His general attitude with respect to answering the inquiries is somewhat illuminated by a statement which he had prepared and sought to read into the record and which he distributed to the press. In this he stated: "From what I have seen and heard of this hearing, the House Committee on Un-American Activities is out to accomplish one thing, and one thing only, as far as the American Motion Picture Industry is concerned; they are going either to rule it, or ruin it."

█ If, as a jury might well find, he wilfully refused to answer these questions, he was guilty of contempt of Congress, a misdemeanor under Title 2 U.S.C.A. § 192, and subject to fine and imprisonment. Lawson and Trumbo v. United States, supra, note 1.

The first clause of paragraph 5, quoted above, says that "The employee agrees to conduct himself with due regard to public conventions and morals * * *." We think it rather elementary that one who, for whatever motive, chooses to conduct himself in such manner as to be guilty of a misdemeanor as serious as this one can hardly be said to be doing so "with due regard to public conventions."

Yet this possible view of Cole's conduct, which appears to us to be inherent in the case, was not advanced at the trial, and no question presenting that theory was propounded to the jury. The questions submitted to the jury, substantially in the form requested by appellant, directed attention to the effect of Cole's conduct upon himself, the community, and his employer. Thus the first three questions were whether this conduct was such as to "tend to bring himself

just give me a chance.

"The Chairman: Supposing we gave you a chance to make an explanation, how long would it take you to make that explanation?

"Mr. Cole: Oh, I would say anywhere from a minute to 20, I don't know.

"The Chairman: Twenty?

"Mr. Cole: Sure, I don't know.

"The Chairman: And would it all have to do with the question?

"Mr. Cole: It certainly would.

"The Chairman: Then would you finally answer it 'Yes' or 'No'?

"Mr. Cole: Well, I really don't think that is the question before us now, is it?

"The Chairman: Then go to the next question.

"Mr. Stripling: Mr. Cole, are you now or have you ever been a member of the Communist Party?

"Mr. Cole: I would like to answer that question as well; I would be very happy to. I believe the reason the question is being asked is that because at the present time there is an election in the Screen Writers' Guild in Hollywood that for 15 years Mr. McGuinness and others—

"The Chairman: I didn't even know there was an election out there. Go ahead and answer the question. Are you a member of the Communist Party?

"Mr. Cole: If you don't know there is an election there you didn't hear Mr. Lavery's testimony yesterday.

"The Chairman: There were some parts I didn't hear.

"Mr. Cole: I am sorry, but I would like to put it into the record that there is an election there.

"Mr. Chairman: All right, there is an election there. Now, answer the question, are you a member of the Communist Party?

"Mr. Cole: Can I answer that in my own way, please? May I, please? Can I have the right? Mr. McGuinness was allowed to answer in his own way.

"The Chairman: You are an American, aren't you?

"Mr. Cole: Yes, I certainly am, and it states so in my statement.

"The Chairman: Then you ought to be very proud to answer the question.

"Mr. Cole: I am very proud to answer the question, and I will at times when I feel it is proper.

"The Chairman: It would be very simple to answer.

"Mr. Cole: It is very simple to answer the question—

"The Chairman: You bet.

"Mr. Cole (Continuing): And at times when I feel it is proper I will, but I wish to stand on my rights of association.

"The Chairman: We will determine whether it is proper.

"Mr. Cole: No, sir. I feel I must determine it as well.

"The Chairman: We will determine whether it is proper; you are excused."

into public hatred, contempt, scorn or ridicule," or to "tend to shock, insult or offend the community," or to "prejudice the defendant * * * as his employer or the motion picture industry generally." In thus emphasizing the effect of what Cole did the court was incorporating into the questions the language of the portion of paragraph 5 following the second word "agrees."[6]

If the position of appellee that judgment in his favor was required as a matter of law is correct, then these questions should not have been submitted to the jury, for, as appellee now argues, the record necessitates a negative answer to them.

■ We think that a jury might well find as a fact that the natural result of Cole's refusal to say whether he was or had been a member of the Communist party was to give the Committee, and the public generally, the impression that he was a Communist,—that his refusal was for the purpose of concealing his actual membership in the party. The event showed that this is exactly the interpretation which the public did place upon the conduct of Cole and of the other witnesses who took a like stand. The fact that his actions were in concert with the others, pursuant to the agreement hereafter mentioned, made this result doubly certain. And because, even in 1947, a large segment of the public did look upon Communism and Communists as things of evil, we think it cannot be said, as a matter of law, that in acting as he did Cole did not breach his agreement.

■ We think the questions relating to the alleged breach of paragraph 5 were properly submitted to the jury; and as indicated before, we think the court might well have submitted to them the question whether Cole intentionally refused to answer the questions put to him, and thus was guilty of a misdemeanor. The obligation stated in the very first clause of the paragraph, that he shall act "with due regard to public conventions," included more than a mere requirement of obedience to law. We think it necessarily includes an agreement to refrain from the commission of a misdemeanor of this character.

It is argued, however, that no matter what might be said of the meaning of paragraph 5 when viewed apart from the conduct of the appellant and its officials, yet in the circumstances shown in the record the appellant was not in a position to assert a breach as ground for the action taken by it. First, it is said that what appellant's executives did and said prior to the hearing was such that Cole was given to understand that if he took the course he did, it would not be regarded as a breach of his contract. Counsel for appellee speak of this as constituting a contemporaneous construction of the contract. The trial judge spoke of it as "acts of the employer considered as authorization and waiver." Both statements have reference to the same set of circumstances, to which we shall presently refer.

Next, it is said that appellant, by its conduct towards Cole subsequent to the hearing, waived any right it might have had to take action against him. While the court put a question to the jury upon this point, and elaborated upon it in a separate finding of its own,[7] the court's opinion indicates

6. " * * * and agrees that he will not do or commit any act or thing that will tend to degrade him in society or bring him into public hatred, contempt, scorn or ridicule, or that will tend to shock, insult or offend the community or ridicule public morals or decency, or prejudice the producer or the motion picture, theatrical or radio industry in general."

7. "11. On October 30, 1947, defendant knew what the acts and conduct of plaintiff were, before said House Committee and in connection with said hearing; notwithstanding said knowledge, defendant after October 30, 1947, accepted and retained plaintiff in its employ pursuant to the provisions of said employment contract as amended, with the intent to keep him as defendant's employee under the terms and provisions of said contract as amended, and accepted the benefit of the services of plaintiff on the screenplay "Zapata", and otherwise, until on or about December 3, 1947. Defendant with full knowledge of the aforesaid acts and conduct of plaintiff did not elect to treat them as a breach of contract, but on the contrary elected to maintain the contract in full force and effect, notwithstanding said conduct."

650

that the trial judge considered a finding of waiver, election, or condonation, necessary as a matter of law.[8]

Finally, it is said that whatever right the appellant might have had to discharge Cole, it had no right to suspend him, or to make the demands which were included in the notice to him, and therefore such notice and demand were wholly without legal effect.

The facts bearing upon the first point, relating to appellant's conduct and statements preceding Cole's testimony, are as follows: In May of 1947 representatives of the Committee on Un-American Activities conducted a private hearing at Los Angeles. It was reported that at this hearing Cole and others in the industry were referred to as Communists. Following that hearing, Mr. Eric Johnston, President of the Motion Picture Producers Association, of which Loew's was a member, proposed to the Association that the members agree not to employ proven Communists in Hollywood on jobs where they would be in a position to influence the screen. The members, including Loew's, declined to agree to this. In the late summer of 1947 two representatives of the House Committee called on E. J. Mannix, General Manager of Loew's, and on Louis B. Mayer, head of its studio. They inquired of Mannix whether he knew if Trumbo and Cole were Communists, to which Mannix replied: "No, and I don't give a damn whether they are Communists

or not. All I am looking for is getting people to write scripts for me and my responsibility if he is a Communist or Democrat or Republican, that the idealogy is not put on the screen, except entertainment is put there. I assume that responsibility, and I feel that it is in good hands right now be-° cause our record is very clear."

Mr. Mayer's report of the investigators' interview with him was as follows: "Well, they argued that we were infested with Communists and we ought to clean house, if we don't Congress will and public opinion will, and so forth, they were after me. And I said that I am not going to fire men on the assumption that they are Communists, when they have done nothing Communistic that I can find and no one has proven they are Communists, and they ought to pass a law telling us how to take care of a situation like that. I don't know what law to fire a Communist on. And he claimed that one of our pictures had Communism." He testified that the two investigators mentioned Cole and Trumbo, two of appellant's writers, as Communists.[9]

At the same time that this was going on negotiations were pending between Cole and Loew's with a view to an amendment of Cole's existing contract to extend the period of his employment, guarantee him more weeks' work each year and increase the rate of compensation. A written agreement to this effect was executed by Loew's

8. "To my mind it is inconceivable that any other conclusion could have been arrived at after Mr. Louis B. Mayer, the executive head of the studio, had completed his testimony."

9. Mr. Mayer also testified as to a conversation he had had with Cole sometime prior to the visit of the Committee investigators, as follows: "My nephew, Mr. Cummings, wanted me to talk with him because he had great faith in his ability and he was a fine worker, and I wanted to talk with him and tell him that I would like to have him develop into a producing writer because of the reports I had had as to his capabilities and possibilities. And I said, 'Why do you do things that they brand you a Communist? And he said, 'I am not a Communist.' 'Well', I says, 'you must be doing something because they keep on saying so.' And he said, 'Well, Mr.

Mayer, I was born very poor, on the East Side, and saw much suffering and hunger, and whenever they talk about the underprivileged or mention it, I usually run off at the mouth and get very excited, and I suppose that is why they call me a Communist.' I said, 'I had poverty; I was born in poverty. Look where I sit now. That is what you can get under the American system.' * * * And one day I said, 'Lester, if this keeps on being said about you'—he was impressed and I was impressed with his desire at that time to get out of it. He said, 'I don't know how you can get out of it.' I said, 'Disavow it is the only way I know.' He was very nice and I was very impressed with the possibilities of this man if this thing wasn't agitated constantly that he was a Communist. And that is about the gist of the conversation and he left me."

on August 21, 1947, and accepted by Cole on September 18, following. It was conceded that Cole's work as a writer was entirely satisfactory.

On October 16, 1947, Cole and others of the so-called "unfriendly" witnesses, including Lawson and Trumbo, published in the "Hollywood Reporter," an advertisement labeled "An Open Letter to the Motion Picture Industry on the Issue of Freedom of the Screen from Political Intimidation and Censorship." In substance it contained a protest against the proposed hearing set for October 20 and charged the Committee with attempting to control the film industry through intimidation of its executive heads.[10] Cole's employer knew of this article.

On October 19, 1947, the six attorneys for the same persons sent a telegram to the chairman of the Committee giving notice that at the opening of the hearing they would move to quash the subpoenas on the ground that the investigation was an unlawful attempt to control the content of motion pictures through censorship and political intimidation; that the Committee was without constitutional power to censor ideas; that the statute establishing the Committee was unconstitutional and void; that the Committee was prohibited by the First Amendment to inquire into matters of thoughts, speech or opinion, and that the Committee had no lawful legislative purpose but that its sole purpose was to stifle free thought and expression. The executives of the picture companies including those of Loew's were furnished with copies of the telegram.

Shortly after the hearings got under way, Paul V. McNutt, counsel for the Motion Picture Producers Association, held press conferences and made some radio broadcasts relating to the hearings. Cole, of course, knew of these. In general, Mc-

Nutt's statements were critical of the Committee hearings and contained statements to the effect that: "The motion picture industry cannot be a free medium of expression if it must live in fear of a damning epithet, 'un-American,' whenever it elects to introduce a new idea, produce a picture typical of the status quo, or point up through a picture some phase of our way of life which needs improvement"; that there was no un-American propaganda on the screen; that McNutt was shocked to see the violence done to the principle of free speech during the hearing; that it was apparent that the purpose was to try to dictate and control what goes on the screens of America and that "this is no concern of a Congressional committee; it is the concern solely of those who produce motion pictures";—"You don't need a law to impair the constitutional rights of free speech; it can be done by intimidation and coercion." He was also quoted as saying that "as a lawyer he would advise the industry to avoid concerted action to compile a blacklist of Communist writers, directors and other studio employees with the idea of denying employment to them."

On October 27, Mr. Johnston, President of the Motion Picture Association of America, issued and caused to be published in the New York Times and the Washington Post an open letter directed to the leaders of the House and Senate, the purpose of which was stated to be "to suggest that the time has come for the Congress to overhaul its procedure in committee investigations to clarify and make secure the rights of individual citizens." It was generally critical of the investigative procedure of such committees and contained the statements: "Too often, individuals and institutions have been condemned without a hearing or a chance to speak in self-defense, slandered and libeled by hostile witnesses

---

10. "Let us be clear. The issue is not the historically phony one of the subversion of the screen by Communists—but whether the screen will remain free. The issue is not the 'radicalism' of nineteen writers, directors, actors who are to be singled out, if possible, as fall guys. They don't count. No one of them has ever been in control of the films produced in Hollywood. The goal is control of the industry through intimidation of the executive heads of the industry * * * and through further legislation. The goal is a lifeless and reactionary screen that will be artistically, culturally, and financially bankrupt."

not subject to cross-examination and immune from subsequent suit or prosecution"; —"One of the most precious heritages of our civilization is the concept that a man is innocent until he is proved guilty";—"We surround our defendants in courts of law with a multitude of protective devices * * these protections and safeguards are denied or short-circuited in Congressional inquiries."

On the same day, which was three days before Cole was called as a witness, Mr. Johnston testified as to the earlier determination of the employers in the industry, previously mentioned, not to make an agreement to refuse to employ proven Communists in Hollywood and gave the reasons for that determination.[11] Cole was present and heard this testimony.

Two further facts should be noted. No representative of his employer gave Cole any instructions as to what he should say or how he should conduct himself when on the stand; and there is no evidence that the employer had any advance information as to how Cole intended to conduct himself.[12]

Upon the basis of the evidence which we have here related, it is argued that the conduct of the employer and its representatives prior to the time when Cole testified, was such as would reasonably cause him to believe that no exception would be taken to

such conduct as that which he manifested on the witness stand.

 We think that it cannot be said as a matter of law that these facts, uncontroverted as they are, establish either that there was a practical construction of the contract as having the meaning appellee says should be attached to it, or that there had been a waiver of performance in advance. Restatement of the Law of Contracts, § 297.

It is true that Mr. Johnston, Mr. McNutt and Mr. Mannix had all indicated that the employer did not intend to blacklist or discharge Communists. Mr. Johnston explained that he had been convinced of the correctness of this determination for "who was going to prove whether a man was a Communist or not?" While Mannix had said when Cole and Trumbo were mentioned to him with an inquiry as to whether he knew they were Communists: "No, and I don't give a damn whether they are Communists or not," it should be remembered that he made this statement to the investigators toward whose errands generally he was quite hostile. He did not make the statement to Cole, who had assured Mr. Mayer that he was not a Communist.

It also appears that the employers as well as the employees resented and disliked the whole investigation and Loew's indicated no

11. "Mr. Johnston: The first reason assigned was that for us to join together to refuse to hire someone or some people would be a potential conspiracy, and our legal counsel advised against it. Second, who was going to prove whether a man was a Communist or not? Was it going to be by due process of law in the traditional American manner, or was it to be arrogated to some committee in Hollywood to say he was a Communist, or some producer, and if they said he was a Communist they might at some future time find he was a Republican, a Democrat, or a Socialist, and not hire him. In other words, who is going to prove that this man was a Communist? And under what methods? Third, that it was the duty of Congress to determine two things: First, was a Communist an agent of a foreign government—as I believe he is and/or second, is he attempting to overthrow our Government

by unconstitutional means. Therefore, it was up to Congress to make these two determinations before we could take action. I must confess they were right on all three points, Mr. Chairman, and that is the reason they did not attempt No. 2."

12. While, for reasons to be stated, we think there was no duty to instruct Cole, yet it does appear that Cole was the last of the "unfriendly" witnesses called. If it may be inferred that they all acted in the same manner, it might also be inferred that when the representatives of the employer heard the first of these witnesses, they had a good idea of what Cole intended to do. The record does not disclose whether in the interval between the testimony of the earlier witnesses and that of Cole, there was any opportunity for the employer to instruct Cole.

objection to the proposal of Cole's attorneys to move to quash the subpoenas. While there was apparently no effort to advise or warn Cole as to how he should conduct himself, a fact to which the trial court seemed to attach much importance, we think that it cannot be said that the employer owed a duty to instruct Cole, for in the circumstances it might well have subjected itself to criticism by the Committee had it undertaken to do so. Had it been disclosed at the hearing that Cole had received instructions as to how to testify, Loew's might well expect to be charged with an improper effort to exert its power as an employer to induce the witness to slant his testimony.

We think all of this falls short of giving approval to conduct calculated to convict Cole of a contemptuous refusal to answer. Nor does it in our opinion compel the conclusion that the employer gave an advance approval to the conduct on the part of Cole which might generally be construed as a broadcasting of his membership in the Communist party.

The conduct of the employer during this period adds up to an attitude of definite hostility and unfriendliness to the Committee hearings, which the producers apparently feared was headed in the direction of censorship of the screen. Thus Cole may have felt that he was justified in carrying a torch for freedom of speech, and in protesting against the proceedings. But we cannot think that as a matter of law this gave him the implied consent of the employer to go so far as to subject himself to a misdemeanor charge. He was plainly ill advised to go to the extreme which he did. A more reasonable course of conduct would have enabled him to trumpet his protest without danger to himself. Thus Mr. Mayer, in his testimony as to his talk with Cole following the meeting, suggested what was patently the more reasonable alternative for Cole, when he asked him why he did not first protest and then answer.[13]

The testimony of the employer's executives given before Cole testified, should have put him on notice that he was not expected to assume the sacrificial attitude which he took. Cole heard Mr. Johnston testify: "I have never objected to your investigating Hollywood. I told you we welcomed it, and we sincerely do," and say in reply to the statement of a Committee member that it was the job of Congress to be certain that agents of a foreign power are not circulating freely in this country, "I think you are right. We welcome that Mr. Congressman." Cole also heard both Johnston and Mayer testify that they would not employ proven Communists as writers.[14]

13. We talked about the hearing and I said it is very unfortunate; that I thought he acted very unwisely and had bad advice, because, if he belongs to the Communist Party, the FBI no doubt has got a record of it, and it was no crime, as I saw it, to belong to the Communist Party at the present time, and he should have answered. Well, he thought some personal rights were involved. And I said, 'You could have told the chairman that "I am advised you have no right to ask me these questions but I can't afford not to answer them. No; I am not a Communist" or "I am a Communist or belong to the Communist Party but I never heard anything subversive or any violence or I would have walked out on them, whichever the case may be, and then you are clear. You wouldn't have any problem on your hands." 'Well', he said, 'I had to stick with the gang. They agreed to do it that way and I had to be with them.' "

14. Mr. Mayer had pointed out that those writers who it was suggested were Communistic, were not proven to be Communists. He testified: "They have mentioned two or three writers to me several times. There is no proof about it, except they mark them as Communists, and when I look at the pictures they have written for us I can't find once where they have written something like that. Whether they think they can't get away with it in our place, or what, I can't tell you, but there are the pictures and they will speak for themselves. * * *

"Mr. Mayer, these individuals that have been mentioned as being reported to you as Communists, do you think the studios should continue to employ those individuals? * * *

"Mr. Mayer: I have asked counsel. They claim that unless you can prove they are Communists they could hold you for damages. Saturday when I arrived

Throughout the hearing the industry representatives had been undertaking to demonstrate to the Committee that their product contained no Communist propaganda. In the face of this obvious effort to play down the so-called Communist infiltration, Cole, (evidently in concert with others), by his tactics of evasion, reasonably construed to be a refusal to answer, and calculated to carry the sting of contempt even more than a mere "I refuse to answer," chose in effect to broadcast to a listening world that it might place what construction it chose upon his refusal to answer whether he was or had been a Communist party member. We cannot say that as a matter of law such action was sanctioned by the prior conduct of his employer.

When Cole was called to Washington to testify he had been working on a screen play entitled "Zapata." After the hearings, which concluded the day he testified, he continued to work on the same play, and received his weekly compensation until the suspension notice of December 2. In respect to those facts the trial court found that "defendant with full knowledge of the aforesaid acts and conduct of plaintiff did not elect to treat them as a breach of contract, but on the contrary elected to maintain the contract in full force and effect, notwithstanding said conduct."

The jury had made the same finding in its answer to question 4. The contention is that this was not a question for the jury, but that the evidence compelled such finding as a matter of law.

What we here consider has been variously called "waiver," "condonation," or "election." The Restatement of the Law of Contracts, § 309, avoids all these terms by calling it "Re-creation of duty by performance or acceptance of performance." If we adopt Mr. Williston's classification it is a problem of "election." See Williston on Contracts, Rev.Ed. §§ 679, 685, 688;

cf. Holt v. Warren, 10 Cir., 176 F.2d 479, 481.

As stated in two of Mr. Williston's section headings, "Acceptance of continued benefits under a contract with knowledge of a defense is an election," and "after election to continue a contract in spite of a known excuse, the excuse cannot be asserted." The question is whether in the circumstances here, it must be held that such an election occurred as a matter of law. When does such an election occur, or as Mr. Williston puts it, "What manifestation of election is final?" As soon as Cole left the witness stand his conduct was fully known to his employer. Are we to conclude that any use of his services thereafter, no matter how brief, destroys any defense? Another question is whether all the facts, of which the party charged with election must have knowledge, were in the possession of the employer prior to the time when it had an opportunity to examine and appraise the great flood of adverse criticism of Cole, his associates, and the film industry which followed the testimony. Or, if that may not be considered, does the party charged with election have a reasonable time within which to make his choice?

There is substantial evidence to show that Cole was informed that his testimony had put him in a predicament from which his employer might have difficulty in extricating him. In a deposition taken prior to the trial Cole testified,[15] (referring to Mr. Strickling, press representative of Mr. Mayer): "Mr. Strickling said he [i. e., Mayer] was terribly upset particularly about the effect of this on Mr. Trumbo and myself and that Mr. Mayer would like to talk to me about the situation. * * * Mr. Strickling at the time said that Mr. Mayer was terribly concerned with the situation in regard to myself and Mr. Trumbo and said that he was seeking some formula of public relations whereby we could, Mr. Trumbo and myself, get out of this.

here I saw in the papers a case where the high court of New York State just held you could not even say a man was a Communist sympathizer without being liable if you cannot prove it."

15. The deposition was used on cross examination of Cole, but what he said in the deposition is not limited to the purposes of impeachment for which it was used. It is an admission of a party.

\* \* \* Later I saw Mr. Mayer in his drawing room. Mr. Strickling stayed for a few moments. His barber who traveled with him, valet, finished a game of gin rummy with him and left and we then had our conversation. Mr. Mayer was visibly upset, quite nervous. He was angry and he said there had to be some way found to straighten out this situation." "I didn't say much for a long time. He was obviously wrought up and I would say anything but calm during this entire conversation. His attitude towards me personally was one of extreme friendliness and a great deal of sympathy for me and I might say for himself, for the position in which he felt he found himself. He hoped that the whole matter would blow over somehow. He didn't know how." "I did very little talking in this except to assure him that I had acted in regard to my best judgment but I had done nothing wrong which I didn't believe in, and that, whether or not he agreed with me, that, since I respected his honest opinions, I expected as much from him towards mine, and he said that was so, and, to the best of my recollection, that just about summed it up with this exception, that he regretted that this had occurred because he had previously stated his plans for me were such, in terms of elevating me above the position of a writer in the studio, and that they were made much more difficult in the face of this added incident. I believe that generally tells the story of what happened there."

Mr. Mayer testified to the same effect. He told how he asked Cole why he did not protest, but answer the Committee's question (see supra, note 13) and testified: "Q. Was anything said in that discussion as to any difficulties created in connection with Mr. Cole's relationship to the studio, and his work there, by reason of his conduct at the hearing? A. If I remember right, I told him I thought he had a great opportunity if this thing hadn't sprung up, but I didn't know what this would do, where it would take us. I think that brought his answer that he had to stick with the crowd or the other fellows and couldn't break away from them."

Thus Cole was told plainly enough that his employer was taking the situation under study. We think that under these circumstances the rule to be applied was suggested by the decision of this court in Compania Constructora Bechtel-McCone v. McDonald, 9 Cir., 157 F.2d 749, 752. In that case an employee, working under a foreman, declined to obey the latter under circumstances amounting to insubordination. The foreman, who had no such authority, told the employee he was discharged. The employee then met the employer's manager and requested transfer to another job and received the reply that the manager "would see". He was told that the circumstances would be investigated and that he should report back for work. This court said: "Thus, appellee first breached the contract and gave the Company sufficient cause to 'fire' him had it elected to so do, but, argues appellee, if it be found that he was guilty of breach of contract the Company waived the breach by offering to continue him in their employ. The alleged waiver is said to find support both in the circumstances of appellee's meeting with McAuliffe and Vessels on the afternoon of July 9th and the District Court's finding that McAuliffe 'elected to overlook what had occurred'. That finding has no support in the record. The testimony shows merely that McAuliffe told appellee to report back the next day and that he meanwhile would investigate the circumstances, and that 'we will see.' McAuliffe could not have known all of the facts, having heard only appellee's side of the controversy. Under these circumstances he could not have waived or condoned appellee's breach of the contract, since a waiver is an intentional relinquishment of a known right. [Cases cited.] Competent managers (and we have a right to assume McAuliffe was one, otherwise he would not have been placed in charge of such an important job) do not formulate personnel policies nor resolve disputes between foremen and employees on the basis of a hurried or partial statement of one side of the controversy."

Here it can be said that immediately following the Washington hearings the employer did not then know all the facts having a bearing upon the effect and the re-

sults of Cole's conduct. True, it was known exactly how he had performed, but it was as yet obviously impossible to evaluate the extent to which Cole had destroyed his own usefulness, or the effect which his continued employment might have upon Loew's and its public relations.

■ But even if it could be said that all the facts were then known, we think the appellant should not be denied a reasonable time to arrive at a course to be pursued. Whether this action, taken 33 days after Cole's testimony, was within a reasonable time is a question of fact, and for the jury.[16] To paraphrase what was said in the Compania-Constructora Bechtel-McCone case, supra, competent managers do not formulate personnel policies on the basis of a hurried or partial consideration of the factors involved. Cole knew that his status had not been decided upon, for if his testimony first given is correct, he was informed that Mr. Mayer "was terribly upset particularly about the effect of this on Mr. Trumbo and myself", and Cole testified concerning Mayer: "He was angry and he said there had to be some way found to straighten out this situation." A jury, if it believed this statement was made, might well find it disproved any "intentional relinquishment of a known right."

The theory upon which Cole's counsel tried this aspect of the case was that until after the Congressional hearing the employer was entirely satisfied if not actually pleased with what Cole had done, that he was put back to work and his services used without any idea of discharging him, and that only after a public uproar arose in consequence of the action of the writers who testified did the executives of the industry, in their surprise and chagrin, determine to try to save themselves by throwing these "unfriendly" witnesses to the wolves.

The verdict of the jury indicates that it may have adopted this view. Plainly this theory made much progress with the court, for a considerable portion of the court's opinion is devoted to an exposition of Cole's claim that Loew's agreed to a policy which involved suspending Cole, only after being persuaded, against its initial desires, to take such action in concert with similar action by other producers. We think that the manner in which appellant came to be persuaded to take the action which it obviously did is wholly without bearing on the case. As respects the action taken, and the right to take it, such matters are as irrelevant as would be a transcript of the debates in its director's meetings.

Finally, it is said Cole should have judgment as a matter of law for the reason that even if we assume Loew's could have discharged him, yet it had no right to suspend him.

The written contract between the parties contained extensive provisions relating to the employee's "suspension" and to "periods in which the employee is not entitled to compensation." It provided in part as follows: "In the event of the failure, refusal or neglect of the employee to perform his required services or observe any of his obligations hereunder to the full limit of his ability or as instructed, the producer, at its option, shall have the right to cancel and terminate this employment, may refuse to pay the employee any compensation for and during the period of such failure, refusal or neglect on the part of the employee, and shall likewise have the right to extend the term of this agreement and all of its provisions for a period equivalent to all or any part of the period during which such failure, refusal or neglect continues. * * * During the period of any such suspension, refusal to pay or leave of absence the employee shall not have the right to render his services to or for any person, firm or corporation other than the producer without the written consent of the producer first had

16. "The doctrine stated at the end of the paragraph obviously involves the corollary that the question of condonation is one which should ordinarily be left at large to the jury. And this is the view which seems to be sustained by the preponderance of judicial authority. The ultimate issue to be determined is whether the servant was retained for more than a 'reasonable' time; unless he had been, there is no condonation." Labatt's Master and Servant, 2d Ed., Vol. 1, p. 602.

and obtained. * * * During any period or periods in which the employee is not entitled to compensation pursuant to the provisions of this paragraph, he shall be deemed to be laid off without pay, and during such periods, of course, the employee shall not have the right to render his services for any person, firm or corporation without the written consent of the producer first had and obtained."

Cole asserts that the hardship worked upon him by suspension is such that it could not have been the intent of the contract that he could be suspended for violation of paragraph 5. He says that the effect of the suspension is that he may not work for the employer, who is relieved from payment of his salary; that the employer may extend the term of the contract for the term of the suspension, and that during the period of suspension he is prohibited from working for anyone else.

Further, he says that these hardships were multiplied in the present case through the attachment to the notice of suspension of illegal and impossible conditions, namely, that the suspension would continue until Cole had been acquitted or purged of contempt, and until he declared under oath that he was not a Communist. He states that the net effect of all this would be to leave him in an impossible position where he could not comply with the notice and could never accept employment elsewhere.

■■■ We think that the notice left Cole in no worse position than that he would have occupied had he received a notice of discharge. The provisions of the contract quoted above which purport to forbid Cole from practicing his profession during the period of suspension are manifestly void under the California Code.[17] Presumably Cole was so notified by his attorneys whose advice the record shows was constantly available to him and who have called our attention to the same provision in their briefs. When this is borne in mind, it is apparent that the notice of suspension was

not so drastic as would have been a notice of discharge, for the notice of suspension permitted Cole to resume his employment if he complied with the conditions, and he was at the same time at liberty to seek employment elsewhere should he choose not to conform.

It is contended that compliance with these conditions was impossible; that he had no control over procuring an acquittal and there were no means by which he could be purged of contempt. As for the required non-Communist oath, it is said that the employer was without power to demand it.

■■■ While the securing of an acquittal was, of course, not a matter within Cole's control, we think that Cole is in no position to assert that he was without power to purge himself of contempt. Had he sought from the Committee an opportunity to reappear before them with notification of his desire to purge himself of contempt, and had he then been refused that privilege, his argument of impossibility would have weight. It does not lie in his mouth to say that he could not have purged himself of contempt for he made no effort to do so.

■■■ We think that at the time notice of suspension was given him, the demand that he purge himself of contempt was not an unreasonable one. By that time the widespread and adverse reaction in the press and other organs of public opinion had become so violent that the executives of the industry had reason for genuine concern lest drastic action in the form of legislation or boycott might be taken. This had come about mainly because of the attitude of Cole and the other "unfriendly" witnesses at the hearing. We think it not unreasonable that the employer should attach the condition that Cole, to the extent possible, undo the harm he had succeeded in accomplishing. As for the non-Communist oath, if the employer was justified in believing Cole's own statement that he was not a Communist, the taking of the oath was likewise within Cole's power.

17. Business and Professions Code, § 16600. "Contracts void. Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

If it be argued that perhaps he was a Communist and therefore unable to take such an oath, and that therefore attaching such condition was the equivalent of notifying Cole that if he was a Communist he could no longer work for his employer, we think that under the circumstances the demand for the declaration under oath, even if it amounted, as suggested, to a notice of discharge if he be a Communist, was not outside the rights of appellant. It is our view that at the time the notice was given the employer would be fully within its rights in giving Cole just such a notice,—that if he was a Communist his services were ended. For the situation had changed entirely from the time when Mannix, the manager, had said he did not care whether Cole was a Communist or not so long as he did good work. When Mannix made that statement there was no occasion to suspect that the public generally had reason to suppose that Cole was a Communist or that the industry was generally employing writers who were Communists. The conduct of Cole and the other witnesses completely changed the situation. A film company might well continue indefinitely the employment of an actor whose private personal immorality is known to his employer, and yet be fully justified in discharging him when he so conducts himself as to make the same misconduct notorious.

The net effect of the hearing was to make Cole a distinct liability to his employer. We think that the insertion of these conditions, which were calculated to furnish Cole with an opportunity to undo a portion of what he had succeeded in accomplishing, was not beyond the power of the employer.

But even if it were to be said that the employer might discharge but not suspend Cole, we think the contention of the appellant correct when it says that if it be found that Cole acted in violation of the requirements of paragraph 5 he could not, having thus breached the conditions of his contract, recover from the employer.

We thus hold that Cole was not entitled to judgment as a matter of law and that his rights must be determined in accordance with the facts as found by a jury. We therefore must deal with the specifications of error relating to the instructions given and refused, and the evidence received and excluded.

We think that a number of the specifications of error relating to the instructions given are well taken. In general we think the court fell into error by undertaking to give instructions upon matters with which the jury were not concerned.

Thus the court instructed the jury at length upon the rights of Congressional committees to subpoena witnesses and ask questions, and upon the rights of the witnesses to decline to answer questions. As we have previously disclosed, the question of whether Cole was guilty of contempt was not one of the issues submitted to this jury. There was therefore no occasion to instruct them upon the subject, except to advise them that the Committee had the right to propound the questions and that it was the duty of Cole to answer them.[18] Instead, this portion of the charge contained such comments as that the witness "may decline to answer certain questions in order to secure from the courts a final determination of the right of the Committee to ask the particular question"; that "when a question is asked of a witness before a committee he may give either a direct or an irresponsive answer"; that "the citizen when interrogated about his private affairs has a right before answering to know why the inquiry is made; and if the purpose disclosed is not a legitimate one, he may not be compelled to answer"; that "a witness rightfully may refuse to answer where the bounds of the power are exceeded or the questions are not pertinent to the matter under inquiry." The instruction concluded with the statement: "And even the alien in our midst, if he be a legal resident, has certain rights and privileges which he may assert and which it is the duty of a legislative committee to respect and of the courts to protect."

We think this portion of the charge erroneous, misleading and prejudicial in that

18. No claim of privilege against self-incrimination was made.

it could not but have the effect of leading the jury to believe that it was for them to decide as to the propriety of the questions, as to whether Cole had the right to refuse to answer, and their answers to the questions submitted were undoubtedly influenced accordingly.

As for the suggestion that Cole had the right to refuse to answer in order to test the right of the Committee to ask the questions, the instruction was particularly misleading, for he who chooses to test the validity of a statute of this kind acts at his peril. "He was bound rightly to construe the statute. His mistaken view of the law is no defense." Sinclair v. U. S., 279 U.S. 263, 299, 49 S.Ct. 268, 274, 73 L. Ed. 692; Eisler v. U. S., 83 U.S.App.D.C. 315, 170 F.2d 273, 280.

The court also instructed the jury at considerable length upon the California law of libel. "You are instructed that in California it is libelous to call a person a Communist. This for the reason that such a charge would expose a person to the hatred, contempt and ridicule of many persons. * * * I have stated that in California an accusation of Communism against a person is libelous. This is so because, under California law, every false and unprivileged publication which exposes a person to hatred, contempt, ridicule or obloquy or causes him to be shunned or avoided, or which has a tendency to injure him in his occupations, is libelous per se. * * * The person who libels another has the burden of proving that the charge is true. He who repeats a libelous statement, if he wishes to justify it, must prove not that another has made the statement, but that the statement is true. These principles should be borne in mind by you in considering the testimony in this case in which reference was made as to certain accusations made against the plaintiff in certain publications and before the Committee which were repeated and discussed in the presence of some of the defendant's representatives. You were admonished at the time when these accusations were repeated here and I admonish you again now that they are to be considered only as having been made and that no one has proved in this lawsuit that these accusations are true. Indeed the truth of these accusations is not an issue in the case. And the reason, as already stated, is that the defendant has not charged the plaintiff is a Communist or a member of the Communist Party".

To the lawyer a discussion of the law of libel might well be understood, as we have no doubt the court intended it, as a statement that the court and the jury may take judicial notice that the public generally looked with scorn and contempt on persons believed to be Communists. Appellant requested such an instruction which the court refused, choosing apparently to discuss the subject by way of reference to the law of libel, and trusting the jury to perceive that the allusion was purely by way of analogy. Lawyers understand such reasoning but we think a jury would not. We are of the opinion that what a jury would most likely believe the judge was driving at was that he was suggesting to the jury that the Congressional Committee was guilty of attempted defamation of Cole, particularly in view of his reference in the instruction to "certain accusations made against the plaintiff in certain publications and before the Committee". We think the court erred in giving this instruction and in not giving the instruction relating to judicial notice requested by appellant.

The court charged the jury at length upon the general subject of "the acts of the employer considered as waiver". The greater portion of this instruction related to the question of whether the acts and statements of the defendant prior to Cole's testimony before the Committee were such as to give rise to a belief on his part that the employer was not concerned about whether he was a Communist and therefore he had the employer's permission to act as he did when he appeared before the Committee.

No question relating to any such issue was submitted to the jury. In question No. 4, the court made inquiry of the jury as to whether defendant waived its right to suspend Cole by its action *subse-*

*quent* to the hearing. This was the only issue relating to waiver that was before the jury. Not only were the matters just referred to wholly inappropriate but we think even if it had been related to a matter submitted to the jury, the charge was inadequate and misleading in giving undue emphasis to the earlier statements made by Mayer and Mannix while omitting evidence as to testimony of Mayer and Johnston with regard to their desire not to hire known Communists, given prior to Cole's testimony. While it raised the question as to whether the employer's actions and statements "led the plaintiff Lester Cole to believe that they were not concerned about charges that he was a Communist", it failed to state that Cole's belief in that regard must have been reasonably justified by what the employer did and said.

The remainder of the instruction related to waiver arising out of the subsequent conduct of defendant. In respect to this the court said: "To put it into a brief sentence: An employer knowing of an employee's conduct which might warrant suspension or termination of employment may not continue employing him thereafter and at a later date treat the employee's conduct as a breach of his obligations. So, here, if you find that when Cole came back from Washington, Loew's knew of Cole's statements and conduct before the House Committee in Washington in connection with the particular hearings, but nevertheless, put him back to work, and accepted his services with the intention of accepting Cole as its employee under the employment contract, then I instruct you that Loew's waived the right to rely upon such conduct in taking action against Cole."

The substance of this language was that if the employment was continued at all, a waiver by election resulted. The vice of this is that it wholly overlooks the circumstances to which we have heretofore alluded which might well require a different result. It overlooks the question of defendant's right to a reasonable time for evaluation of the results of Cole's testimony and to evolve a personnel policy, and the question whether viewed as a whole

its conduct evinced an intentional relinquishment of a known right.

We have discussed the question of waiver and the instructions relating thereto without alluding to appellant's contention that waiver was not an issue because no such issue is mentioned in the portion of the pre-trial order listing the questions to be tried. Appellee asserts that the issue of waiver was properly in the case because much of the evidence bearing upon the question was received without objection. Appellant points correctly to the fact that some evidence offered for this purpose was in fact objected to as not within the issues, and, since when the first evidence of this general nature was offered the objection was overruled, it may not have been necessary thereafter to repeat the objection. Appellant further says that some of the evidence relied upon to establish waiver was in any event admissible for other purposes and that therefore no inference that the issues should be deemed amended can be drawn from any failure to object to evidence of that character.

Since the view which we take of the whole case requires us to order a new trial, upon which it may well be that the issues will be enlarged, we think it unnecessary to pass upon the contention that no issue whatever relating to waiver should have been submitted to the jury.

■■■ Another portion of the charge which we think was not relevant to any issue before the jury, dealt with the status of the Communist party. The court charged: "At the same time, I instruct you that in California it is lawful for a person to be a member of the Communist Party, and to register with the Registrar of Voters of a county as a member of such party. In California, the Communist Party is entitled to participate in elections, including primary elections, and to nominate candidates. And, while, under the California law, any party which carries on or advocates the overthrow of the government by unlawful means or which carries on or advocates a program of sabotage may not participate in primary elections, the courts of California

have ruled that the courts do not take judicial notice of the fact that the Communist Party advocates the overthrow of the government by force or violence, and they have also ruled that a registered Communist is not guilty of a violation of the State law by the mere fact of membership in the Communist Party. You are to bear these facts in mind in judging whether the conduct of the plaintiff was as charged by the defendant."

If it were to be an issue before the jury as to whether the Communist Party was lawful or unlawful, whether it was in fact not a political party but a "conspiratorial and revolutionary junta", "dominated and controlled by a foreign government", seeking to attain its goal by "violent and undemocratic means", and whose members are agents of a foreign power "to execute the Communist program",[19] then evidence of these matters should have been received, since, at least in 1947, they were not matters of which the court might take judicial notice. Communist Party v. Peek, 20 Cal.2d 536, 547, 127 P.2d 889; Schneiderman v. United States, 320 U.S. 118; 63 S.Ct. 1333, 87 L.Ed. 1796; Stasiukevich v. Nicolls, 1 Cir., 168 F.2d 474.

Appellant sought unsuccessfully to introduce such proof. The offer was rejected on the ground as stated by the court, that "I do not think the question was material or that the question is one that is the subject of proof in this case."

 This brings us to a discussion of appellant's specification of error relating to this rejection of its offered proof. Even if it may be assumed that such evidence would be logically relevant to the issues in this case, it does not follow that it was error to reject the offer.

This is a case which has primarily to do with the question of whether Cole violated his employment contract, and whether Loew's had the right to take the action which it did in consequence of such violation. While that inquiry necessarily touches upon the question of the effect of Cole's conduct upon public opinion generally, we think that the true character of the Communist Party and the true nature of membership therein, is far from being a primary issue in this case. It is relatively remote. We think that if in the trial of this case evidence of the character here offered were to be received, the result might well be to produce undue confusion in the minds of the jurors. The issues relating to an alleged breach of contract might be lost from sight behind a mass of testimony relating to the purposes of the Communist Party.

We think it was properly within the discretion of the trial court to exclude such testimony under the principle which gives rise to what Mr. Wigmore calls "the simplificative rules of evidence." This principle, which results in the exclusion of evidence otherwise relevant, is stated by Mr. Wigmore as follows: "(a) If the use of certain evidential material tends to produce undue confusion in the minds of the tribunal,—i.e. the jurors—by diverting their attention from the real issue and fixing it upon a trivial or minor matter, or by making the controversy so intricate that the disentanglement of it becomes difficult, the evidence tends to the suppression of the truth and not to its discovery; and there is good ground for excluding such evidence, unless it is so intimately connected with the main issue that its consideration is inevitable. (b) So also, if certain evidential material, having a legitimate probative value, tends nevertheless to produce also, over and above its legitimate effect, an unfair prejudice to the opponent, * * * there is good ground for excluding such evidence, unless it is indispensable for its legitimate purpose." Wigmore on Evidence, Third Ed., § 1864.

 Evidence as to the true character of the Communist Party having been thus properly excluded, it was improper and

19. Opinion of Jackson, J., American Communications Assn. v. Douds, 339 U.S. 382, 424, 70 S.Ct. 674, 696, concerning what Congress could have accepted as common knowledge of Communism. For a later Congressional recital, see Internal Security Act of 1950, § 2, 50 U.S.C.A. § 781.

misleading for the court to charge the jury, as it did, upon this matter.

Upon cross-examination of Cole, appellant sought to inquire whether Cole was in fact a member of the Communist Party. Objection to the inquiry was sustained.

 In the context of the instructions as given this inquiry should have been permitted, for the court not only instructed the jury that the violation of contract charged must have been done "wilfully and intentionally," but as we have indicated, told the jury that a witness before the committee "also has rights. He may decline to answer certain questions in order to secure from the courts a final determination of the right of the Committee to ask the particular question." Thus the court indicated that Cole's motive in refusing to answer was material. If it was, appellant should have been permitted to show the possibility of a different motive,—a motive to conceal his actual party membership.

But since his motive is not material, Sinclair v. United States, supra, we think the error lay, not in rejecting the inquiry, but in giving the instruction, as we have previously stated.

We do think that the true import of Cole's behavior on the witness stand should not be judged without considering it in the light of what his associates, the other "unfriendly" witnesses, had done when they preceded him upon the stand. The record contains his own admission that what he did was in consequence of his agreement with the others. We think the jury were entitled to know what this concerted action was, for only by observing all of it could Cole's conduct be judged in its actual setting, and in its entirety. The court erred in excluding evidence of the conduct of these other witnesses.

For reasons which we have previously stated, we think that if the question of waiver or election by subsequent conduct is to be submitted to the jury, the actual effect of Cole's conduct upon public opinion generally becomes material. We think the court unduly restricted the scope of the evidence upon this point, and that

appellant's offers of proof to this end should have been received. If the offered evidence is to be credited, it would indicate that when the employer's officers acted to suspend Cole, they knew the industry, and its standing with the public, had been dealt a heavy blow. The evidence which brought this knowledge to them they should have been permitted to present to the jury.

We think these errors require us to reverse the judgment and to remand the cause for a new trial.

It is so ordered.