KELLEMS PRODUCTS, INCORPORATED, complainant,

*v.*

ARCHIBALD T. COLEY, PHILIP J. MARTIN and MARTIN & SON PRODUCTS COMPANY, INCORPORATED, defendants.

[Decided May 31st, 1932.]

*Messrs. Lindabury, Steelman, Zink & Lafferty,* for the complainant.

*Messrs. Congleton, Stallman & Hoover,* for the defendants.

BACKES, V. C.

The Kellems Products, Incorporated, manufactures grips used by telegraph, telephone and lighting companies to lug cables through conduits. Coley, one of the defendants, was the shop foreman of the Kellems company under a term of years, who covenanted that he would not, for five years after his term of service, engage in the business of cable grips within one hundred miles of New York City. He was discharged for unfaithfulness after one year's service and has since incorporated Martin & Sons Products Company, Incorporated, manufacturer of cable grips, Newark. He and Martin each own one-half the capital stock. Coley attempts to justify the breach of the covenant on the ground that he was unlawfully discharged; the burden is upon him to show it, but the Kellems company undertook that task. This is the story, with some of the background: Miss Kellems, the owner of the Kellems company, sold grips for about a year before

she organized the Kellems company, in March, 1928, and began manufacturing her own grips, invented by her brother. Before that Martin & Son manufactured grips for her according to the invention. When she determined to manufacture her own, Coley, who was then Martin & Son's mechanic, agreed to go with her; he implies that she seduced him from his employer. The Kellems grip, like those of other designs, is made of wire woven on a mandrel into a circular form of wide mesh, which, when clasped to the cable secures contact by its spread produced by the pulling. One of the distinguishing features of the Kellems grip is that on the pulling end of the grip the wires of the grip are fastened into a lug with an eye to which, in operation, the pulling mechanism is attached. In fastening the wires of the grip into the lug it is required to first dip the ends of the wires into acid to remove the oily surface in order to give proper adhesion to the zinc solder with which they are soldered into the lug, otherwise, when stress is applied, the wires would pull out of the lug, seriously interrupting operation when in use. Coley had been fully instructed in the method; he was a mechanic trained in making grips, and knew the consequences of not strictly adhering to it. During the early period of 1929 trouble began to brew; Miss Kellems' brother had invented a collapsible mandrel of which Coley claimed to be the inventor; there was strain. Coley refused to sign petty cash slips; refused to correctly report the daily output of grips; reported among the help that it was his money that was running the business; incited the help to protest against a day's delay in the payment of their wages during Miss Kellems' illness; and he appropriated to his own use a check for $20 paid by a customer for swivel grips ordered of the company, which he made in the factory from the company's wire, representing that he had made them at his home. These were minor things compared with what followed, but they created tension, tended to disorder, and evinced his frame of mind, which grew less and less friendly towards his employer. That Coley, during this period, had re-established contact with his former employer, Martin, is not shown as a fact, but his con-

duct and what follows, indicates that he had it in mind. Promptly upon being discharged he joined Martin, formed the corporation, Martin & Son Products, Incorporated, and was given one-half the capital stock for the mandrel he claims to have invented. The invention will be spoken of later. In February, 1929, a Kellems grip, while in use by the Brooklyn Edison Company, pulling a cable through a conduit, separated; the wires of the grip pulled out of the lug, a most unusual occurrence. Miss Kellems became alarmed and suspicious and made haste to call in all shipments made since the first of January. Out of various shipments totaling three hundred and forty-six grips, ninety-seven were defective at the lug; the ends of the wires had not been dipped in acid to remove the oil to admit of proper soldering, with the result that the lug pulled off. In a shipment of twenty-four to the Brooklyn Edison, six were bad, and of a shipment of three to Cuba, all were defective in the same way and from the same cause. The higher proportion of defective grips were found in shipments to the larger customers. Miss Kellems experienced no such misfortune in her business before or since. Had it not been quickly detected and promptly remedied, Kellems grips would have been condemned in the trade, and the business ruined. Asked for an explanation, Coley professed ignorance of defective workmanship or of the cause for the commotion. If he was sincere, this is a strange coincidence: Martin reported to a Kellems purchaser in Chicago on February 15th, 1929, that he understood the Brooklyn Edison Company were having trouble with Kellems grips pulling apart, when, as a fact, the first occurrence of the kind occurred February 16th, a day later. How did he know it was to take place? At the trial he said Joe Rachwalske told him, but Joe had left the Kellems employ in November before. How could he know? Indicative also of Coley's attitude of indifference, to put it mildly, to his employer's welfare, is the established fact that he intentionally made a shipment of grips different from those ordered. It is unnecessary to find that improperly constructed grips in shipments with perfectly put together grips was intentional

and a conspiracy to injure the reputation of Kellems grips, difficult as it is to put down the suspicion and to understand why the prescribed formula was not uniformly followed and why faulty grips were distributed among the different shipments. Coley knew the formula and disregarded it, and he was conscious that not following it would result in disaster to his employer. The enormous percentage of defective grips during the short period compared with the uniform perfection before and after, whether the result of his neglect or malice, justified the discharge.

It is held that Coley's discharge was justified. The legality of his covenant not to engage in a similar line of business is not challenged, and it will be enforced in the language of the covenant.

Another object of the bill is to restrain Coley and his company from using the collapsible mandrel, a shop secret of the complainant. Grips were woven before on a solid mandrel, the weave being spaced by pins or screws set in the mandrel, which had to be separately removed to release the grip, to strip it from the mandrel. During the first week of the Kellems company's operation, Miss Kellems' brother invented a mandrel which does away with the taking out of the pins or screws, by fastening the pins or screws to strips surrounding a pipe or the like. When the weaving of the grip is finished, the pipe is withdrawn from the strips, they collapse, releasing the pins or screws through the mesh; a simple labor and time saving contrivance. Coley helped him, made suggestions, and later made a duplicate out of Kellems company material, in the shop. He claimed the invention, and a dispute arose between him and Miss Kellems. His insistence was the beginning of the end, but pending settlement of the question between him and her brother she paid him—one calls it a bonus, the other a royalty—for the use, both stipulating that the payment was without prejudice. When Coley went back to his former employer, Martin, he got one-half the capital stock of the company for the invention, and they are now using it in fabricating grips. Coley applied for a patent, so did Kellems, who filed an interference in the patent office

with the result that the patent examiner found that it was Kellems' invention and that Coley copied it. Coley claims to have invented the mandrel in December of 1927, while working for Martin before he entered the Kellems company employ, and Coley's wife and Martin claim to have seen the model at that time, and that it was in actual use in Martin's shop, but there is much in the testimony to discredit their story. Why should Coley suppress for a whole year an invention of so much economic importance to the trade in labor and time saving and of such money value to him, upon which he later profited to the extent of co-partnership in his former employer's business? Why was he so helpful with his suggestions to Kellems when Kellems was designing the mandrel? Why did he not mention that it embodied his earlier ideas, and why did he not protest against the adoption of his ideas by Kellems? Why did he not disclose to Miss Kellems, his new employer, his new idea and seek advancement from her either in wages or an interest in the business? And why, if it was invented while in Martin's employ, did not Martin claim the shop rights, as was his right? And if Martin saw it and observed its advantages over mandrels then in use, why his indifference towards it then and his great anxiety for it a year later when he gave up a half interest in his old established business for its use?

Coley brought into court models of his progressive ideas as they supposedly took shape in material form. His original working models are strangely like the finished product; they show no intermediate thought from the primary conception to the completed article, which might ordinarily be expected. His second or experimental model, supposedly constructed in the course of developing the commercial form, was made up of six strips, of a total of eight, admittedly taken from a mandrel then in use in the Martin company's shop, persuasive evidence that the experimental model was made afterward and was not a step in the evolution of the mandrel in dispute, and that it is a fraud. One more thing: Coley says he had the strips made by one Walsh in December, 1927—the sliding strips are the essence of the new device.

Walsh's shop adjoins the Martin company's shop, but Walsh was not produced. He could have convincingly established Coley's priority. The defendants Coley and his company will be enjoined from using the mandrel.

Present form of decree on notice.