**SAWYER v. E. F. DREW & CO., Inc.**

Civ. No. 984.

United States District Court
D. New Jersey.

April 7, 1953.
As Amended June 1, 1953.

Lum, Fairlie & Foster, Newark, N. J., by Raymond Troy, Newark, N. J., for plaintiff.

McGlynn, Weintraub & Stein, Newark, N. J., by Edward R. McGlynn, Newark, N. J., for defendant.

MODARELLI, District Judge.

This is an action to recover damages for breach of a written contract of employment. Plaintiff, Alton S. Sawyer, was employed as superintendent of edible production by the defendant, E. F. Drew & Co., Inc., at its Boonton, New Jersey, plant for a period of five years, commencing January 3, 1949. He was discharged on July 27, 1950, after

serving for one year and seven months, and he claims he was discharged without justifiable cause. The case was tried without a jury.

■ The issue is single: Was termination of contract by employer for justifiable cause?

The applicable law can be stated in brief:

"The servant owes the master the duty of faithfulness, whether expressed in the contract of employment or not. It is an implied, if not an express, term thereof. It follows that any conduct on his part which amounts to unfaithfulness * * * is misconduct calling for a discharge." Carpenter Steel Co. v. Norcross, 6 Cir., 1913, 204 F. 537, 541.

■ Misconduct prejudicial to a master's interests is good cause for discharge, but the misconduct must be gross, e. g., insubordination, exerting a bad influence over other servants, producing injury to the employer's business. Lubriko Co. v. Wyman, 3 Cir., 1923, 290 F. 12; Allen v. Aylesworth, 1899, 58 N.J.Eq. 349, 44 A. 178; Kellems Products, Inc., v. Coley, Ch. 1932, 160 A. 639, 10 N.J.Misc. 695; and Carpenter Steel case, supra.

■ Unless the contract of employment is one which can be terminated at will, the employer cannot arbitrarily discharge an employee, but any misconduct inconsistent with the relation of employer and employee, or which is prejudicial or likely to be prejudicial to the interests of the employer, is good ground for an employee's discharge. In re Nagel, 2 Cir., 1921, 278 F. 105, 109. The refusal to obey reasonable lawful instructions constitutes grounds for discharge, though an employee cannot be held to literal standards of absolute obedience. Compania Constructora Bechtel-McCone v. McDonald, 9 Cir., 1946, 157 F.2d 749, 753. See also Keserich v. Carnegie Illinois Steel Corporation, 7 Cir., 1947, 163 F.2d 889.

■ Where the facts are in dispute, as in the instant case, what constitutes a ground for discharge is a question for the jury. Lubriko Co. v. Wyman, supra; Accord Stoffel v. Metcalfe Construction Co., 1945, 145 Neb. 450, 17 N.W.2d 3.

■ The burden of proving justification for the discharge rests upon the employer. The law will not assume that an employee has been derelict in his duty from the fact that he has been discharged. 35 Amer. Juris., Section 59. See 49 A.L.R. 488 et seq.

■ Stripped of non-essentials, the evidence discloses the following facts:

Plaintiff commenced his duties under the contract on January 3, 1949. His extensive experience with Lever Bros. Co., a large producer of vegetable oils, was utilized by defendant in setting up the new refinery. Plaintiff's immediate supervisor was Peter Kalustian, the general production superintendent. Mr. Volpp, the vice president of production, was their superior. The president of the company was Ernest F. Drew.

The chief engineer of the company, Seymour Faulkner, worked with plaintiff on the refining process but was neither above nor below plaintiff in the chain of command. Faulkner and plaintiff did not enjoy a friendly relationship with one another and their friendship was not heightened by the fact that in May of 1950 Faulkner was instrumental in securing one John A. Preston, a former colleague, to replace plaintiff as superintendent of edible production. Plaintiff was given subordinate responsibility and title. Defendant now had two $15,000 a year men of similar ability in the same division.

Plaintiff was experienced in this field, and defendant admittedly drew upon his valuable advice and suggestions. Just three weeks prior to plaintiff's discharge, President Drew characterized plaintiff as "well qualified as a manufacturing executive" in an inter-office letter to Mr. Preston, plaintiff's successor.

The corporation was in the process of expansion when plaintiff joined it. For cottonseed refining it was installing continuous flow machinery known as Sharples equipment which was guaranteed to produce a refined oil with 30% less loss than the established batch kettle system. By

the terms of the guarantee, if the Sharples equipment failed to effect the stated savings, defendant had the privilege of returning the equipment. Trial runs yielded results which exceeded the guarantee, however, when official tests were performed the Sharples equipment fell short of the mark.

Plaintiff testified that there were two official tests, the first in October 1949 and the second in January 1950. Defendants allege that a third test was made in May 1950, but defendant's Refinery Summaries for the months of April and May 1950 state "Sharples did not operate" for that period. Testimony also showed that certain parts of the equipment were sent back to the Sharples people for repair or replacement at that time, so that obviously the equipment was not capable of production during April or May 1950. All agree, however, that the tests, whether two or three in number, were unsuccessful.

Working under plaintiff was one Sullivan and two brothers, William and Silvio Garro. About December 15, 1949, plaintiff discovered two Refinery Logs in the wastebasket of the refinery office. They showed that Mr. Sullivan had falsified records on the refinement of soya oil. There is a conflict of testimony as to whether plaintiff reported these falsifications to Mr. Kalustian, but as the logs did not refer to runs on the Sharples equipment, they are material only in that they indicate that one of the workers, Sullivan, was untrustworthy. Sullivan also had on occasion without permission changed plans and orders issued by Sawyer. This inevitably led to arguments between Sawyer and Sullivan. Plaintiff reported these differences to Preston. Defendant alleges that in the course of questioning the Garro brothers regarding the arguments, the latter accused plaintiff of ordering them to falsify the Sharples test runs. Silvio Garro testified: (1) Plaintiff had ordered him to take oil from the Sharples run and add it to the batch kettle run during the official test of January 1950; (2) Plaintiff had ordered him to effect a decrease in the Sharples yield of the official test of May 1950. The refinery records show that there was no official test in May of 1950, when the latter order was allegedly given to Silvio Garro. Silvio Garro said he did so falsify the runs but did not report the alleged orders or the falsifications to his superiors.

William Garro testified that Sawyer had ordered him to take oil from the Sharples run and add it to the batch kettle run, which he refused to do. He likewise failed to report the alleged order to his superiors.

Significantly, William Garro and Silvio Garro were not only retained by the defendant in spite of their roles in the alleged falsifications and failure to report the same, but were both promoted in rank and received increased salaries. William Garro was given the responsibilities once entrusted to the plaintiff.

The charges made by the Garro brothers are serious and must be closely scrutinized. Their testimony was somewhat evasive. William Garro referred to "all those fake records," impliedly made by plaintiff, but when pressed could identify only the two log sheets falsified by Sullivan, which did not concern the Sharples equipment. The defendant's attorney, Seymour J. Lowenstein, drew up a written accusation for William Garro to sign, which he signed after plaintiff was discharged. The statement was not submitted in evidence. In fact, William Garro testified that he was better qualified than Sawyer for the position as superintendent of edible production and that Sawyer was building on his ability. The latter did admit when pressed that plaintiff had previous experience with the Sharples equipment, made good suggestions as to its installation, and knew "what he was talking about"; that success of the Sharples equipment would have made plaintiff's job as superintendent easier. Silvio Garro testified that he was ordered by plaintiff to falsify two tests, the January test and the May test, the existence of which is highly improbable in view of the refinery records. With this discrepancy must be considered the fact that during the test runs when Silvio Garro allegedly falsified the yield under plaintiff's orders, the Sharples people were overseeing the entire operation and were present when the yield was poured and weighed. It would seem likely that any attempt to minimize the

Sharples performance by the obvious method alleged would have been detected by the Sharples technicians. Furthermore, Silvio Garro's accusation is incongruent in view of his failure to report the falsifications of Sullivan, of which he admittedly had knowledge. Finally, despite this failure to report and despite his part in the alleged falsification, Silvio Garro was promoted to become a member of supervision after plaintiff's discharge.

From the foregoing and in view of plaintiff's credible testimony, this court is not convinced that Mr. Sawyer falsified the tests or ordered that they be falsified. I have examined the testimony and exhibits with great care to determine what possible motive plaintiff could have had for falsifying the Sharples runs. I find none. Defendant offers as a motive the strong antipathy and jealousy between plaintiff and Sullivan, but defendant does not show how falsification and failure of the Sharples tests would inure to plaintiff's favor or to Sullivan's detriment. Defendant offers as an alternative motive plaintiff's desire to show that "his method of refining, an improvement in the well-known 'Batch' method, was so far superior to the Sharples method that it would prove beneficial to him and result in a promotion in defendant's organization." But there are pertinent fallacies in defendant's hypothesis. Firstly, the batch method was not shown to be plaintiff's at all. Secondly, plaintiff himself recommended the Sharples method as a superior process and made valuable suggestions as to its employment. Thirdly, success of the Sharples process would make plaintiff's job as supervisor much easier than under the batch system. Reason or emotion direct the actions of men. Any motivation upon plaintiff, such as to induce the alleged misconduct, is neither apparent, impliable, nor proven. Rather than plaintiff's misconduct, a more likely reason for his discharge seems apparent. Once defendant hired Preston in May 1950 to replace plaintiff as superintendent of edible production, it had the burden of paying two men $15,000 a year for duplicate skills. Defendant thereupon with undue haste discharged plaintiff, either failing to credit

plaintiff with sufficient perseverance to enforce his legal rights or failing to ascertain beforehand their rights and obligations under the contract.

We come now to the circumstances of plaintiff's discharge. Preston, Kalustian, and Faulkner testified that during the course of investigation of quarrels between plaintiff and Sullivan they learned from the Garro brothers and one Andrew Blaho that plaintiff had falsified or ordered falsification of the Sharples run. They did not consult Sawyer regarding these accusations by his subordinates. On the morning of July 27, 1950, they summoned plaintiff to Faulkner's office. There Faulkner, not plaintiff's superior, related the accusations to plaintiff in the presence of Kalustian and Preston. They gave plaintiff the alternative of resigning or being fired. Plaintiff asked Kalustian if he ever had reason to be suspicious of plaintiff's performance or integrity and was answered in the negative. Plaintiff asked to be permitted to see the Garro brothers about the accusations privately but was denied the opportunity. Plaintiff then asked to see Mr. Drew but was denied that opportunity. Faulkner testified specifically that when Sawyer asked to see Drew, he, Faulkner, stepped into Drew's office to relay the request but that Drew refused to see Sawyer. Mr. Drew testified that he "certainly did not" refuse to see plaintiff; that no one relayed plaintiff's request to him and stated that if he had known of plaintiff's desire to see him he would have complied. Mr. Drew's testimony on this point was straightforward and highly credible.

This important inconsistency, together with all of the other facts reviewed above, leads this court to believe that the plaintiff was unfairly accused of and found guilty of misconduct and summarily discharged without good cause. Defendant has not borne the burden of justifying the discharge, rather, it is my distinct conclusion that the discharge was arbitrary.

Plaintiff's proof of damages, which were not contested, were:

(a) Expenses in seeking employment, $2,511.70 (T-65-66);

(b) Salary loss in 1950, $6,250.00 (T-67);

(c) Salary loss in 1951, $9,912.52 (T-67);

(d) Loss in salary in 1952 up to September, $5,306.66 (T-68);

(e) Loss in salary, September through December 1952, $2,213.33 (T-68);

(f) Loss in salary, balance of contract period, $6,640.00 (T-69); and

(g) Total of loss in salary and expenses, $32,834.21 (T-69).

Plaintiff will be allowed that amount with interest at three per cent on items (b), (c), (d), and (e) through April 7, 1953, with costs.

An order may be submitted in conformity with the opinion herein expressed.