NATIONAL LANDSCAPING COMPANY,
Inc., Plaintiff,

v.

CONTINENTAL CASUALTY COMPA-
NY, Inc., et al., Defendants.

No. 1996.

United States District Court
W. D. Missouri, S. D.

March 5, 1965.

Arthur B. Cohn, Cohn & Lentz, Waynesville, Mo., for plaintiff.

Rafter, Biersmith, Miller & Walsh, Kansas City, Mo., for defendants.

JOHN W. OLIVER, District Judge.

This case presents a question not heretofore decided in any of the other Fort Leonard Wood Capehart cases. Consistent with the pattern of pre-trial procedures that has been followed in connection with the numerous cases involved in that litigation, the parties have entered into a stipulation of fact and have isolated for pre-trial determination the particular question of law presented in order that further proceedings be simplified.

Briefly stated, the stipulation establishes that plaintiff, National Landscaping Company, Inc. was awarded the $80,000.00 seeding and sodding subcontract by D & L, the prime contractor, who in turn was bonded by defendant Continental Casualty Company, Inc.

National's complaint alleged that "the plaintiff complied with the terms and conditions of the [subcontract] and furnished labor and materials on [the] project in the amount of $80,000.00" (paragraph 8 of plaintiff's complaint) and that D & L, the prime contractor, "failed and refused to pay the balance due and owing the plaintiff on said contract in the amount of Forty Thousand, Six Hundred, Twenty-Four and $\frac{23}{100}$ Dollars ($40,-624.23)" (paragraph 9 of plaintiff's complaint). Judgment for that amount, of course, is prayed for against the defendant surety on its bond.

The answer of the defendant expressly denied that "plaintiff complied with the terms and conditions of the [subcontract] and affirmatively alleges that this plaintiff breached, failed and refused to carry out and perform the obligations incumbent upon it under the terms of said contract, the damages proximately resulting therefrom to defendant's principal and the cost to said principal in completing and remedying such defaults and failure far exceeding any sums otherwise due this plaintiff for the performance thereof" (paragraph 8 of defendant's answer).

The question presented for pre-trial decision is whether, under the stipulated facts and applicable law, National, the subcontractor, is entitled to recover for labor and material furnished by it on the job after D & L, the prime contractor, allegedly declared a default and allegedly terminated the subcontract.

Various paragraphs of the stipulation detail the sad history relating to the execution of the subcontract. Paragraph 17(a) of the stipulation and the exhibits referred to therein establish that "D & L and National were involved in disputes over the manner, extent, and timeliness of the performance of the work of the subcontract almost from its inception." The subcontract was executed August 19, 1959 (Exhibit 3).

Paragraph 17(b) of the stipulation and exhibits 13 and 14 reflect that finally "D & L notified National on or about September 5, 1962, of certain alleged deficiencies in the performance of the work by National and of its intent to declare a default under the terms of the aforesaid subcontract on or about September 10, 1962." That paragraph also states that on September 11, 1962, D & L advised National that it had "failed to correct [its] default set forth in [D & L's] letter of September 5, 1962," and that "therefore, any rights you may have had under such subcontracting agreement are hereby terminated." As will be later noted, the action above taken had been threatened many times before.

It is also stipulated, however, that in spite of the alleged declaration of default and termination, National in fact continued to perform certain work on the job until December 7, 1962, and that D & L had actual knowledge of and permitted that work to be performed. The parties further agree that the factual basis for their respective and conflicting contentions are fully set out in certain correspondence exchanged by them and attached to the stipulation as Exhibits 15, 16 and 17, all of which we will discuss later in detail.

Paragraph 17(b) (iv) of the stipulation fairly outlines the mixed question of fact and law presented for our pre-trial decision. It is there stated that:

"National urges that these communications [Exhibits 15, 16 and 17] constituted a novation or modification of the original subcontract or a waiver by D & L of its rights to the remedies provided therein on default by National. Continental, on the other hand, submits that the continuance by National on the job was permitted under such correspondence 'in order to minimize damages' resulting from National's default, and in exercise of the rights conferred on D & L by the subcontract to get the work done. (Exhibit 3, Paragraphs 4 and 16)."

The parties also agree that "should the Court conclude that the circumstances and documents * * * constitute a novation or modification of the subcontract, or waiver by D & L of its rights thereunder, then the extent, manner and timeliness of National's performance of the subcontract would be of importance only in measuring the value of National's work for purposes of recovery on the Continental bonds sued upon (Exhibits 1 and 2), if the Court should find and rule that National is entitled to only the value of its work performed and not the balance due under the contract."

The parties further agree that should such a finding and determination be made, then "National would be entitled to recover the value [of its work] (not to exceed the unpaid balance of the contract price), after allowing the expenses incurred by D & L in completing the work of the subcontract as a credit" (Paragraph 17(a) of the stipulation).

As will be made more apparent when we discuss Exhibits 15, 16 and 17 in detail, it is clear that the basic contention of defendant Continental is that it is entitled to the full benefit of the alleged default and termination declared by D & L and that it is in no way liable for any work done after that time by National. National's basic contention is that either by way of "novation," "modification," or by "waiver," or perhaps by a combina-

tion of the legal theories expressed by those or similar words, it has the right to recover in accordance with what it claims is the agreement of the parties spelled out in Exhibits 15, 16 and 17.

We have reviewed all of the lengthy correspondence and the voluminous documentary evidence attached to the stipulation but do not find it necessary to make specific comment on the details revealed by that mass of material. By way of general and introductory comment, we believe it is only necessary to refer to what was said in Carrier Corp. v. United States, (Ct. of Cl.1964) 328 F.2d 328, for an apt description of what all of the stipulated facts establish beyond reasonable doubt. Chief Judge Jones there stated that "[i]n the tangled skein of facts and chaos of discussion and letters, it is difficult to weave anything other than a confused pattern" (page 334 of 328 F.2d).

Exhibit 15, however, established that in spite of the default and termination allegedly declared in early September, 1962, National was nevertheless permitted to continue to work on the job and that the parties did in fact attempt to bring some order out of the general chaos of the job in their telephone conversation of October 30, 1962.

Exhibit 15 is a letter from Mr. Fitzpatrick, Continental's attorney, dated October 31, 1962. In that letter Mr. Fitzpatrick confirmed that in the telephone conversation of October 30, 1962, with National's president, Mr. Slattery, "it was agreed" that National "would furnish the trees necessary to replant dead trees in Mortgage Area C–9 and all the trees in mortgage area C–10."

Mr. Fitzpatrick also advised National in that letter that "as soon as possible, I will furnish you with an itemization of all monies spent by D & L Construction Co. & Associates in performance of your contract which will be deducted from the contract amount and the balance, if any, will be paid to you upon the final release of escrowed landscaping funds."

We note also, for purposes of later discussion, that Mr. Fitzpatrick suggest-

ed twice in that letter that the agreement was being made by D & L in order "to mitigate" or "to minimize" the damages that allegedly resulted from National's alleged default of the subcontract.

Exhibit 16 is a letter dated November 17, 1962, written by National to Mr. Fitzpatrick in response to Mr. Fitzpatrick's letter of October 31, 1962. That letter stated "for the record" that National "never agreed that we were or are in default, as we never left the job or ceased working." National's letter did, however, confirm that "we, as we said on the telephone, will be willing to allow the deduction of monies, on a cost basis, expended by you on C–9 in connection with the seeding, if any, and sodding you performed on that area." National added that it understood that D & L wanted the job "completed at contract pricing less deductions."

Both D & L and National evidently continued to work side by side on the job from October 30, 1962, until the job was completed sometime in December, 1962. Exhibit 17 is a letter from Mr. Fitzpatrick, attorney for D & L, to Mr. Slattery, president of National, in which "an itemization of expenditures of D & L Construction Co. & Associates incurred in performing work in your behalf on your subcontract" was enclosed for National's approval.

Exhibit 17 again confirmed that National had been "allowed to continue working" and that "it was agreed that any amounts expended by my client [D & L] in performing work covered by your subcontract agreement would be deducted from any balance to which you might otherwise be entitled." (Exhibit 17 also reiterated D & L's contention that its reason for permitting National's continuation on the job was for the purpose of "mitigating damages to you or your surety which would accrue from the default.")

Paragraph 18 of the stipulation contains National's admission "that D & L did some work in regard to the subcontract"; and that National at sometime in the future, and before trial, would "ad-

mit some of the items as listed and itemized on Exhibit 18"; but the stipulation also states that the items that appear on that exhibit "have not yet been checked out and verified."

Exhibit 18, the itemization enclosed in Mr. Fitzpatrick's letter of December 27, 1962 (Exhibit 17), shows that D & L claims the expenditures of direct landscaping costs, excepting payroll, in the amount of $10,013.00; that it claims it expended $17,318.98 on direct labor, $4,-950.00 for administrative and supervision expense, and $3,340.36 for insurance and workmens compensation expenses (computed at 15% of the payroll), or a total labor cost of $25,609.34; making a grand total of $35,622.34, claimed by D & L as having been expended by it on the job. The amount of National's expenditures is not stated, but the parties seem to be agreed that National's expenditures exceeded the difference between D & L's claim and the unpaid balance due on the subcontract.

If we sustain defendant's contention, National would be entitled to nothing. If, on the other hand, we should rule that the parties are bound by the understanding reflected by Exhibits 15, 16 and 17, then National would be entitled to recover the value of its work performed after D & L's declaration of the alleged default and the termination. The legitimate expenses incurred by D & L as reflected by Exhibit 18 would, of course, in the latter event, be first paid from the unpaid balance of the contract.

■ We find and determine that defendant is bound by D & L's election to forego all rights that might have been conferred on it by the default and termination clauses of the subcontract and that National is entitled to recover in accordance with the clear agreement of the parties that it would be paid the contract price after the legitimate expenditures made by D & L toward the completion of the contract are paid in full. We, of course, do not rule in this opinion how much of D & L's present claim of $35,622.34 is or is not legitimate. As will be noted later, our order directing

further proceedings will require the parties to confer about that matter in order that the Court be advised at the scheduled pre-trial of the respective positions of the parties.

We note at the outset of our discussion of the applicable legal principles that counsel's alternate use of the words "novation," "modification," and "waiver," reflects a semantic confusion bred by courts; not by counsel. A review of the cases in this particular field of contract law do not, however, reflect any confusion or divergence of basic legal theory on the part of courts; the decided cases merely illustrate that particular courts knowingly use different words to describe and apply what are quite well established principles of contract law.

Our Court of Appeals for the Eighth Circuit, for example, in Nelson v. Seaboard Surety Company, 8 Cir. 1959, 269 F.2d 882, 890, applied principles of contract law that were described by the State law as involving the doctrine of "waiver" to a case in which counsel had referred to the applicable principle as one involving an "election" because, as Judge Van Oosterhout expressively put it: "Waiver is at least very closely related to election."

Judge Pope, in Loew's Inc. v. Cole, 9 Cir. 1950, 185 F.2d 641, cert. denied 340 U.S. 954, 71 S.Ct. 570, 95 L.Ed. 688, explained the semantic problem involved by stating that:

> "What we here consider has been variously called 'waiver,' 'condonation,' or 'election.' The Restatement of the Law of Contracts, § 309, avoids all these terms by calling it 'Re-creation of duty by performance or acceptance of performance.' If we adopt Mr. Williston's classification it is a problem of 'election.' See Williston on Contracts, Rev.Ed. §§ 679, 685, 688; cf. Holt v. Warren, 10 Cir., 176 F.2d 479, 481."

The principle applicable to this case is fairly stated in Section 309 of the Restatement of the Law of Contracts but

we, as did the Ninth Circuit in Loews, Inc., supra, believe that use of Professor Williston's nomenclature will express the applicable principle in language more familiar to the Bench and Bar than that used in the Restatement. Cf. Specialties Development Corp. v. C-O-Two Fire Equip. Co., 3rd Cir. 1953, 207 F.2d 753, 756, wherein Judge Goodrich accepted Williston's statement of the applicable principle and makes only footnote reference to Section 309 of the Restatement.

Our acceptance of Williston's broad classification of the cases under what he calls the principle of "election" is not to reject the cases cited by the parties that describe the applicable principles as a "waiver," or a "modification," or a "novation," or by any other name. Our acceptance and use of Williston's terminology is for the purpose of making use of that authoritative work in our statement of the well established legal principles we believe are applicable to this case.

In Section 687, page 292 of the 3rd Edition of Williston on Contracts, it is stated:

> "The commonest case of election in the law of contracts arises where, with knowledge of a breach of condition or a defense excusing performance, a promisor either refuses or continues to accept performance from the other party. As the only theory upon which the benefit of such performance can be rightfully received is on the assumption of an election to continue the contract, that assumption is made if the injured party accepts further performance."

Williston's full discussion of the principles established by the cases, which always involve highly variable factual situations, commences with Section 678 in which he suggests on page 244 that quotations of definitions of "waiver" give little aid in determining the rights of particular parties and that "more progress will be made, therefore, if, instead of merely considering what courts have said about waiver, an analysis is made of the various meanings given the word and of the possible situation which may involve surrender of rights or excuses for non-performance, together with a statement of fundamental principles applicable to these situations."

In Section 680, on page 258, it is recognized that "either prior to the time of performing a contract, *or after its breach*, the parties may agree that one or both of them shall do something different from the performance which the original contract specified" (emphasis ours).

And in Section 683, on page 269, the following is stated:

> "Election as a term in the law is properly applied to a case where a person has the choice of one of two alternative and inconsistent rights or remedies. In choosing the one, he necessarily surrenders the other. This principle is not out of harmony with the general rule that the surrender of a right requires a sealed release or consideration, because the choice made by election gives the one making it an advantage which he could not otherwise have had. Though he surrenders one right, he gains by so doing another inconsistent right. *Thus where a contract is breached in the course of its performance, the injured party has a choice presented to him of continuing the contract or of refusing to go on.* If he chooses to continue performance he has doubtless lost his right to stop performance, but in the nature of the case, he could not exercise the two inconsistent rights of which he had the choice." (emphasis ours).

See also Section 684, page 275, where it is made clear that: "In a correct definition of waiver, wherever that word is used in the sense of election, the requisite of even apparent intention to surrender a right is absent. The law simply does not, under the circumstances, permit a party to exercise two alternative or inconsistent rights or remedies. Even though he expressly states that he intends to reserve a right, he will, nev-

ertheless, lose it if he takes an inconsistent course." And see finally Section 685, page 279, where it is stated: "The choice of an alternative right by one entitled thereto will often be followed by action of the other party based on justifiable reliance upon the apparent attitude of the former, or, at least, the situation of the parties will be so materially changed as to make a new choice unfairly prejudicial."

■ There can be no doubt but that D & L had every right to declare a default and terminate National's subcontract. National's neglect of its contractual obligations was exceeded only by D & L's administrative ineptitude in failing to have done something about National's failure to act long before it wrote its letters indicating that it intended to enforce its rights under paragraphs 4 and 16 of the subcontract. But D & L could not, under the principles just stated, declare a default and terminate the subcontract and then elect to pursue a course of action totally inconsistent with its initial declaration. We suspect that if courts in the past had spoken in the vernacular concerning the applicable principles of law that we would find expressions suggesting the inability of one both to have and to eat cake.

Under paragraph 4 of the subcontract D & L had the right (a) to declare a default and to request National's surety to proceed with the work; (b) to supply its own material and labor necessary to maintain progress, without declaring a default, and to charge that cost and expense to National and/or its surety; (c) to terminate and let the work to another subcontractor; and (d) to terminate and pay National on the basis of the work in place. Paragraph 16 authorized D & L, in the event of breach, to terminate and take possession of all materials and to finish the work in any way that it deemed expedient.

D & L sent copies of its letters of September 5, 1962 and September 11, 1962 (Exhibits 13 and 14, respectively) to National's surety but there is no evidence that a formal demand was ever made at that time to the surety to proceed in accordance with the express provisions of the subcontract. Of course, we are quite confident that National's surety was completely cognizant of what was going on because it received copies of much of the voluminous correspondence that preceded those letters. Presumably, National's surety took the position that somehow the matter would either go away, or perhaps be worked out. The present record, at the very least, does not indicate that National's surety felt much concern about the consistent and exceedingly poor performance of its principal.

Be all of that as it may, the stipulation of the parties and Exhibits 15, 16 and 17 establish beyond question that D & L, instead of following a course of action consistent with its alleged default and termination of National, elected to permit National's continuation on the job under the agreement for payment included in that correspondence.

The law does not permit D & L or its surety at this late date to reserve and to exercise rights which it obviously elected to abandon. Its choice of permitting National to make further contribution to the job justified National in believing that D & L's apparent show of toughness was no tougher in connection with its two letters sent in early September of 1962 than had been its other threats to declare a default and termination which commenced as early as May 5, 1961. Exhibit 10(i) establishes that as early as May 5, 1961, D & L advised National that "if we receive no satisfaction in the way of approval on sod for our job by May 12, 1961, we shall be forced to inform the bonding company of this, and request that they immediately take action." Exhibit 10(o) reveals that a similar threat was made by telegram dated August 10, 1961; Exhibit 10(t) is a similar telegram dated November 27, 1961; Exhibit 10(z) is a similar letter dated May 15, 1962; Exhibit 10(aa) is a similar letter sent by certified mail dated May 22, 1962, with a copy, however, being sent to National's bonding

company; Exhibit 10(cc) is a similar letter dated June 8, 1962; Exhibit 10 (hh) is a similar letter dated August 27, 1963, addressed to both National and its bonding company, being sent this time by registered mail; and still other exhibits reflect that D & L's demands and threats most frequently were prompted by either telephone calls, letters or telegrams from the Contracting Officer of the United States Corps of Engineers.

Again, if the words of the vernacular were the language of the law, reference to the fable of the boy who cried wolf would be appropriate. Certainly after the telephone conversation of October 30, 1962, and the correspondence confirming the agreements then made was in hand, National could reasonably assume that D & L meant to abandon its rights under the subcontract and to seek National's aid in the completion of the work.

There remains only for specific discussion D & L's contention that it permitted National to continue solely for the purpose of allowing National to mitigate or minimize the damage. Mr. Fitzpatrick's attachment to that theory which would permit D & L to both have its cake and eat it is reflected not only by his effort to inject that thought in his letters to National of October 31, 1962, (Exhibit 15), and December 27, 1962 (Exhibit 17), but also by his earlier night letter, dated September 11, 1962 (Exhibit 10(kk)) to National's bonding company which contained loose reference to a theory of mitigation.

Section 688, page 300, of Williston is the short but complete answer to D & L's effort to excuse its election to permit National to continue to work on the job on any theory that D & L reserved its rights under the subcontract and intended to consider National's work subsequent to the alleged default and termination as a volunteered mitigation on National's part. That section states:

"The principle is general that wherever a contract not already fully performed on either side is continued in spite of a known excuse, the defense thereupon is lost and the injured party is himself liable if he subsequently fails to perform, unless the right to retain the excuse is not only asserted but assented to."

National's response of November 17, 1962 (Exhibit 16) made clear that any assertion that D & L may have made concerning National's "mitigation" was not only not assented to by National, but that D & L accepted National's additional work to the job with knowledge that National did not even consider that it was in default under the subcontract. We so find.

In light of the foregoing, and for the reasons stated, we rule the preliminary question submitted to us by the stipulation of the parties in favor of National. We therefore determine that in all subsequent proceedings the parties may anticipate that the Court will rule that National is entitled to the value of its work performed and that defendant is under obligation to pay National the difference between the value of that work and the unpaid balance of the contract price, after the legitimate expenses incurred by D & L in completing the work are first subtracted from said unpaid balance. National, of course, will be required to prove the value of its labor and materials and is not automatically entitled to the difference between the unpaid balance of the contract price and the legitimate expenditures of D & L.

Because both the amount of National's claim and the amount of D & L's legitimate expenditures are undetermined, this case is set for further pre-trial conference on the pre-trial calendar presently scheduled in our Southern Division at Springfield to commence on March 8, 1963, unless the parties, subject to the approval of the Court, can agree upon a more convenient time and place for a pre-trial conference to be held prior to March 26, 1965.

The parties are directed to confer in order that the Court be advised as prompt-

**800**

ly as possible in order that the Court may know:

(a) Which items set forth on Exhibit 18 will not be admitted by National as legitimate expenses of D & L and what items in National's claim will be admitted by defendant Continental;

(b) What day it will be most convenient for counsel to have this case scheduled for further pre-trial on either March 8, March 9, or March 10, 1965, at Springfield or on some other date in Kansas City prior to March 26, 1965, subject to the convenience of our Kansas City docket.

We again express our appreciation for the excellent cooperation evidenced by counsel for all parties throughout all the extended Capehart litigation and particularly in connection with this case which is the last case on the docket involving this particular prime contractor and its bonding company.