In re **LEIDEN CORPORATION** Debtor.

**LEIDEN CORPORATION, Plaintiff,**

v.

**A.F. LUSI CONSTRUCTION, INC., Defendant.**

**Bankruptcy No. 8300699.**
**Adv. No. 840061.**

United States Bankruptcy Court,
D. Rhode Island.

Jan. 16, 1987.

See also, Bkrtcy., 59 B.R. 239.

John P. McGann, Coffey, McGovern, Noel & Neal, Ltd. Providence, R.I., for plaintiff.

Salvatore Butera, Jr., James J. McKenna, Providence, R.I., for defendant.

## DECISION

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

Heard on February 19, 1986 on Leiden Corporation's complaint alleging breach of contract by A.F. Lusi Construction, Inc. (Lusi). Leiden initially sought $92,728.55 for work, labor and materials, $10,000 for loss of profit, and interest and attorneys' fees. *See* Complaint at 2. Leiden later reduced its main request to $90,665.95, based on what it now considers to be the correct amount due under the contract, subtracting direct payments to Leiden or its suppliers, and adding a "reasonable profit" on the work remaining. *See infra,* at 5–6. Lusi disputes Leiden's figures, and counterclaims for $40,000.

## DISCUSSION

■ The following few facts are the only ones not in dispute:[1] On February 28, 1983, Leiden entered into a sub-contract[2] with Lusi, the general contractor, to perform site work (utility, sub-base, etc.) at the Launcher Laboratory Building, Naval Underwater Systems Center, in Newport, Rhode Island. *See* Plaintiff's Exhibit 1.

1. This decision constitutes our findings of fact and conclusions of law required by Bankruptcy Rule 7052 and Fed.R.Civ.P. 52.

2. After the hearing, and at a point in time where we had already devoted considerable time and effort in deciding this matter, we noticed that the subcontract in question contains a clause providing that disputes arising thereunder, such as the instant controversy, are to be "decided by arbitration." *See* Plaintiff's Exhibit 1, Article 13.1. Although we are sorely tempted to put these parties back to where they belonged more than three years ago, i.e. in arbitration, the amount of legal and judicial time already invested in this proceeding make that a most impractical alternative. Because of that compelling consideration, and because it has taken forever (or at least it seems so) to get these parties to trial, we disregard our instinct to refer the matter for arbitration, and instead will render our decision. We do so, however, with the admonition to counsel that their joint failure to point out the arbitration provision was a breach of their obligation as officers of this Court, which should not be repeated.

The contract price was calculated as follows:

| | |
|---|---|
| $259,690 | Original contract price |
| 17,533 | Change order |
| 1,080 | Extra excavation |
| $278,303 | Total contract price |

*See* Joint Pre-trial Order.

Work at the site began, and between April and December 1983, Leiden received payments from Lusi totalling $153,721. Lusi also paid $31,877 directly to certain of Leiden's suppliers. So much for what is agreed to.

Following are the disputed issues of fact and law, as to which the parties are in sharp disagreement:

1. The reasonable value of work and materials Leiden provided to Lusi.

2. The amount Lusi paid to other subcontractors after Leiden's stoppage, and which of those backcharges are recoverable by Lusi.

3. The amounts and reasonableness of payments made by Lusi to Leiden employees.

4. Does Lusi owe Leiden $446.25 for providing an operator for Lusi's forklift?

5. Does Lusi owe Leiden $1,434.90 for the premium paid by Leiden on a performance bond?

6. Did Lusi breach the contract in question, and if so, is it nevertheless entitled to recover money expended to complete Leiden's part of the job?

7. Did Leiden breach the subcontract, and if so, the legal consequences of such breach.

8. Is Lusi entitled to overhead and profit on monies paid by it to suppliers and employees of Leiden?

9. Is Leiden entitled to interest on progress payments due when work stopped, and if so, at what rate?

10. Whether Leiden is entitled to lost profits on the balance of the contract not completed, and if so, in what amount?

■ The reason(s) for Leiden's work stoppage in February or March 1984, before it completed all of its obligations under the subcontract, is one of the many items in dispute. Leiden argues that it "did not complete the job because of Lusi's failure to make timely progress payments pursuant to [Article 12.4.1] of the contract." Plaintiff's Post-trial Memorandum of Law at 1. Although, the testimony and exhibits support Leiden's allegation that Lusi did not comply with the payment schedule in Article 12.4.1, *see* Plaintiff's Exhibits 2–13, 18, based on the credible testimony and the documentary evidence of record, Lusi's decision to withhold progress payments was justified and reasonable. We conclude that Leiden's failure to complete work on the Launcher Laboratory project resulted from its own financial and other difficulties which predated, and which were not related to the subcontract with Lusi, and which led to the filing of the Chapter 11 petition on October 5, 1983.[3]

In that regard, Armand Lusi, president and general manager of defendant A.F. Lusi Construction, Inc., testified that prior to the execution of the subcontract (but unknown to him until March 1983), Leiden was delinquent as to union fringe benefit payments. *See* Defendant's Exhibits R, T, HH. Even Hugo Key, II, vice-president and treasurer of Leiden Corporation, admitted that Leiden was in arrears of payments for union benefits due on jobs performed prior to the subject contract, but he argued that Armand Lusi, because of his membership on the Board of Trustees of Local 271, was aware of that fact before this subcontract was negotiated and executed. Lusi testified convincingly, however, that he knew nothing of Leiden's union difficulties until after Leiden began work on the Launcher Lab project, when he began receiving letters and telephone calls from union representatives threatening to stop the job. *See* Defendant's Exhibits T, R. Leiden's failure to pay required union benefits is a violation of Article 15.2 of the subcontract, and placed it in breach *ab initio,* which breach was never remedied. Leiden also materially defaulted on the subcon-

---

**3.** The case was converted to one under Chapter 7 on February 6, 1985.

tract by failing to segregate and pay withholding taxes as required by Article 11.32. *See* Defendant's Exhibit S.

Leiden's financial problems worsened, and in the spring of 1983 Westport Sand and Gravel, Inc., Pine Hill Sand & Gravel, Inc., and several other vendors and suppliers contacted Lusi to complain that Leiden was not making payments when due. *See* Defendant's Exhibits O, P. These complaints continued, with Armand Lusi receiving weekly telephone calls from suppliers, and despite Hugo Key's repeated assurances that those difficulties would be taken care of, as would the payment of delinquent taxes and union fringe benefits.

The evidence also establishes that in September 1983, Lusi notified Leiden of its dissatisfaction with the quality of Leiden's work, and that the work was behind schedule. *See* Defendant's Exhibit U. Lusi testified, and we find as a fact, that Leiden's tardiness in completing certain work called for under the subcontract, such as installation of hydrants, held up other subcontractors, and placed the entire job behind schedule. In October 1983 Lusi began taking over and performing work which was Leiden's obligation under the subcontract, and eventually Leiden stopped work on the project altogether, in March 1984.

■ On the facts before us, we must conclude that Leiden Corporation substantively breached the subcontract, both as to its financial obligations and as to performance, while Lusi was, at most, in technical breach because of its failure to make timely progress payments. More importantly, however, we also conclude that neither Leiden nor Lusi's respective breaches excused performance by the other, where the parties elected (by their conduct) to ignore significant contract provisions and the other's default, and continued to treat the contract as a continuing obligation. *See Cities Service Helex, Inc. v. United States,* 543 F.2d 1306, 1315–1316, 211 Ct.Cl. 222 (1976); *Western Casualty and Surety Co. v. Herman,* 318 F.2d 50, 55 (8th Cir.1963); *National Landscaping Co. v. Continental Casualty Co.,* 238 F.Supp. 793 (W.D.Mo. 1965); 17 Am.Jur.2d *Contracts* § 447 (1964). Our task here is less an intellectual matter of contract interpretation than a determination, on a quantum meruit basis, of who owes whom what.

Leiden calculates the amount allegedly due from Lusi as follows:

| | |
|---|---|
| $238,770.00 | Basic contract work completed |
| 17,533.60 | Change order |
| 1,434.90 | Performance bond premium |
| 1,080.00 | Extra excavation |
| 446.25 | Forklift operator |
| 12,815.20 | Retainage due |
| $272,079.95 | |
| − 31,877.00 | Lusi payments to Leiden's suppliers |
| − 153,721.00 | Direct payments to Leiden |
| $ 86,481.95 | |
| 4,184.00 | Reasonable profit on remaining work |
| $ 90,665.95 | Amount owed Leiden |

Although Leiden submitted requisitions to Lusi totalling $238,770, *see* Plaintiff's Exhibit 2–13, Lusi disputes the value of Leiden's work. Lusi maintains that to complete the job, it expended or obligated itself to pay $307,447 (including direct payments to Leiden of $153,721), that "it is mathematically impossible for Leiden's figure of [$238,770 for work actually performed] ... to be accurate," *see* Defendant's Post-trial Memorandum at 6, 7, since the amount expended by Lusi to finish the project was well over the contract amount. *See* Defendant's Pre-trial Summary at 5.

■ Based on the record, we are unable to determine, with precise accuracy, the value of the work performed by Leiden. But we are aided in that task by the fact that, as Hugo Key testified, all of Leiden's vouchers were pre-approved by Lusi's project manager, James Findlen. Some vouchers were even reduced, and resubmitted, at the request of Mr. Findlen. *See* Plaintiff's Post-trial Memorandum at 3. Accordingly, in the absence of proof by Lusi that the value of the labor and materials furnished by Leiden was less than

$238,770,[4] we accept that figure, as a starting point, for the remainder of this "analysis."

The early but meager good will existing between the parties became eroded in the fall of 1983, when Lusi received notice of an I.R.S. levy in the amount of $88,891.47, against funds owed to Leiden. *See* Defendant's Exhibit S. As Leiden's financial situation continued to deteriorate, more suppliers began to refuse to deliver unless they received payment for overdue accounts, and until Leiden satisfied its past due obligations for union fringe benefits. To prevent the complete cessation of the job, Lusi made direct payments to the following suppliers of Leiden:

| | |
|---|---|
| Pine Hill Sand and Gravel | $15,000.00 |
| Westport Sand and Gravel | 2,646.00 |
| Public Works Supply | 2,657.00 |
| E.L. LaBaron Foundry | 4,275.00 |
| Griffin Pipe | 5,476.00 |
| Suburban Sales | 1,823.00 |
| Total | $31,877.00 [5] |

*See* Joint Pre-trial Order at 1.

■ In October 1983, Leiden's troubles were intensified when some of its employees refused to work until union fringe benefits were paid up to date. Leiden does not contest that its workers were placed on Lusi's payroll, but questions the amount paid by Lusi to those employees. Lusi shows, through records kept in the ordinary course of business, that it paid $8,450, *see* Defendant's Exhibit A, while Leiden makes the naked claim that only $7,496.56 was paid by Lusi to Leiden's employees. We resolve this relatively minor discrepancy in favor of Lusi, since Leiden has not shown to our satisfaction that Lusi's documented figure is incorrect. *See* Defendant's Exhibit A.

■ In February 1984 Leiden was notified by Lusi's superintendent that, notwithstanding all their prior difficulties, work could be recommenced. Believe it or not, Leiden declined this offer and refused to proceed unless it first received payment of funds allegedly past due from Lusi. Not surprisingly, this put the finishing touch on what was left of the business relationship of the parties, and on or about March 6, 1984 Leiden was specifically ordered off the job by Lusi. Thereafter, Lusi engaged subcontractors, purchased materials, hired its own laborers, and completed Leiden's subcontract.

The following backcharges, substantiated by Armand Lusi, and not refuted by Hugo Key, are determined to be reasonable.

| | |
|---|---|
| Equipment rental | |
|     *See* Defendant's Exhibit G. | $19,704.00 |
| Material | |
|     *See* Defendant's Exhibit G. | $ 1,870.00 |
| Granite curbing | |
|     *See* Defendant's Exhibit I | $ 2,700.00 |
| Gravel paving | |
|     *See* Defendant's Exhibit J. | $17,955.00 |
|     Total | $42,229.00 |

■ As to the $12,086 claimed by Lusi for the cost of labor, *see* Defendant's Exhibit F, we find that backcharge to be adequately supported and reasonable, except for $2,575 charged for the project manager. Although union regulations require a project manager to be paid at a specific rate, that amount is subject to review. Because in this instance the project manager was supervising only one man, we find the reasonable value of those services to be $1,545.

■ The subcontract provides for retainage, in lieu of a performance bond, as follows:

| | |
|---|---|
| First 2 months | 15% |
| Second 2 months | 10% |
| Remainder of project | 5% |

*See* Articles 5.2 and 7.

However, on November 14, Leiden billed Lusi $1,434.90 for the cost of obtaining a performance bond with the Union Indemnity Insurance Co. *See* Plaintiff's Exhibits

---

**4.** In November 1983, Armand Lusi estimated that Leiden had completed only $190,000 worth of work, but that figure was clearly a "guesstimate," and unsubstantiated.

**5.** Certain suppliers have made claims against Lusi's bonding company, but Lusi has introduced no evidence as to the status of these claims.

15, 19. Hugo Key testified that Armand Lusi verbally agreed to pay the premium. That version was contradicted by Lusi, who conceded that he requested the bond when Leiden's financial difficulties were mounting, and that he even withheld some payments until Leiden obtained the bond. But Lusi was equally adamant that he told Key he would not bear the cost of the bond. This is a credibility call which is resolved in favor of Armand Lusi. On equitable grounds as well, since the bond was requested only after Leiden's failure to pay union fringes, taxes and suppliers, and on account of Leiden's failure to perform in a timely fashion on the subcontract generally, the cost of such a bond is reasonably and properly charged to Leiden.

■ Lusi's on-site superintendent engaged a Leiden engineer to operate one of Lusi's forklifts, on a job not related to the instant subcontract, and on January 27, 1984 Leiden billed Lusi $446.25 (17½ hours at $25.50/hour) for those services. *See* Plaintiff's Exhibit 14. Armand Lusi admits that his company used the services of Leiden's forklift operator, but he claims that the quid pro quo was that Leiden was allowed to use one of defendant's compactors. Further, Lusi claims that Leiden caused damage to hoses and form panels. There is no documentation to support Lusi's position, and we find that Leiden is entitled to recover the $446.25 labor charge.

■ Regarding Lusi's claim for ten percent overhead ($5,432) and five percent profit ($2716) on amounts paid to Leiden's suppliers and laborers, because of its late payments on vouchers (a breach of the subcontract which Leiden claims contributed to its failure to complete work on the project), we conclude, again on equitable grounds, that Lusi is not entitled to either overhead or profit. Lusi's request for amounts for which it *may* have to indemnify its bonding company ($33,724—*see* Defendant's Post-trial Brief at 6), is too speculative. Similarly, considering the equities (or lack thereof, on both sides), Leiden's requests for interest on progress payments due at the time work stopped is denied, as is its demand for lost profits on the balance of the contract. *See* Joint Pre-trial Order at 5. Finally, the documentary evidence, *see* Defendant's Exhibits T, EE, FF, HH, GG, II, JJ, R, and the testimony of Armand Lusi clearly show that Lusi assumed certain obligations for fringe benefits which Leiden owed to union locals 57 and 271. Since the obligations have been established, the amounts paid on these obligations are recoverable to the extent that Lusi establishes that they have been paid.

The amounts credited to Leiden are as follows:

| | |
|---|---|
| $238,770.00 | Value of labor and materials provided by Leiden |
| + 446.25 | Owed to Leiden for use of forklift |
| $239,216.25 | |
| − 153,721.00 | Payments by Lusi to Leiden |
| $ 85,495.25 | |
| − 31,877.00 | Direct payments by Lusi to Leiden's suppliers |
| $ 53,618.25 | Balance due for the value of Leiden's work |

The following charges are allowed to Lusi:

| | |
|---|---|
| $ 42,229.00 | Backcharges |
| 8,450.00 | Payments by Lusi to Leiden's employees |
| 11,056.00 | Cost of labor to complete the project |
| $ 61,735.00 | Total cost to Lusi to complete Leiden's sub-contract |

To summarize, based on the above findings and conclusions, we hold that the value of the work for which Leiden is entitled to be paid under the contract is $53,618.25. Offsetting that is the $61,735.00 which Lusi was required to expend to complete Leiden's unfinished work. Accordingly, Leiden's claim in the amount of $53,618.25 is allowed and Lusi's counterclaim is allowed in the amount of $61,735.00, resulting in a net award to Lusi of $8,116.75,[6] the difference between Lusi's expenditures to complete the Leiden sub-contract, and the value

---

**6.** This amount should be altered, and the judgment amended, if Lusi submits evidence of the exact sums paid for union fringe benefits, obligations which were originally owed by Leiden and later assumed by Lusi.

of services and materials rendered by Leiden, but unpaid.

Enter Judgment accordingly.